Booth, -Judge,
reviewing the facts found to be established, delivered the opinion of the court.
The plaintiff, Lewis M. Haupt, a distinguished civil engineer, secured letters patent for certain improvements in dikes and breakwaters. The patent was granted April 3, 1888, and the letters patent numbered 380,569. This suit is for the recovery of compensation for the alleged use by the defendants of said patented device in completing the improvement of Aransas Pass Harbor on the coast of the Gulf of Mexico, in Texas.
The facts disclose a jurisdictional issue, and while the findings are necessarily voluminous, the real development of the case, in so far as it happened, and the order of events is not open to much dispute. On March 22, 1890, the Aransas Pass Harbor Co. was duly incorporated under the laws of Texas. In May, 1890, Congress passed an act, 26 Stat., 105, authorizing said company to construct within certain time limits a navigable channel in Aransas Pass Bay to result in the end in connecting the waters of the Gulf of Mexico and those of the Aransas Pass Bay and the Bay of Corpus Christi on the coast of Texas. The enterprise was a difficult one and the work to be done of vast public importance. The attempt under the first act of Congress resulted in a failure, *598 i. e., it was found impossible to meet the time limit set forth in the statute and this, together with other engineering difficulties, precluded the company from the benefits of the statute. On January 22, 1894, 28 Stat., 26, Congress passed a second statute wherein additional time was granted the company for the completion of the work and the rights of the company in the premises otherwise recognized. The plaintiff herein proposed, after the passage of the act of January 22, 1894, to the harbor company the free use of his patented jetty. The license granted was upon the sole condition that the plaintiff himself was to supervise the work of construction and to receive, in conjunction with another engineer, the sum of $1,000 when the work was successfully completed and the patented device demonstrated its worth. The company was to pay nothing for the use of the patent or the preparation of the plans and specifications. The company accepted the plaintiff’s proposition with certain limitations. The plaintiff prepared the plans and drawings, submitted the same to the company, and it was found to involve too much expense to proceed in strict accord therewith. The company viewed the use of the patented jetty as more or less experimental and requested the plaintiff to modify his proposed plans of construction to meet its limit of financial outlay, which he did, resulting finally in the proposed construction of one-half of the patented jetty in order to determine its utility. In July, 1895, the Aransas Pass Harbor Co. contracted with Charles Clarke & Co., of Galveston, Tex., to construct the jetty in accord with the modified plans theretofore prepared by the plaintiff, and Clarke & Co. proceeded with the work until January 22, 1896. More than two years later, in May, 1898, the Congress by proper legislation initiated the preliminary steps for taking over the improvement of the harbor by direct appropriations. On May 28, 1898, the Senate concurred in a resolution adopted by the House of Representatives authorizing the Secretary of War to prepare and submit plans and specifications for said improvement, together with estimates of cost necessary to complete the improvement of the harbor and secure the proposed inlet. A board was created by the Secretary in pursuance of said resolution and a detailed report followed covering the ex *599 tent, plan, and cost of the proposed work. The plaintiff in the meanwhile had called the attention of Members of Congress to his patented jetty and urged its adoption, and while the report of the aforesaid board was pending before the House Committee on Rivers and Harbors, the plaintiff appeared in person before said committee and submitted an offer to complete the improvement of the harbor for $700,000, a sum less than the estimate of the board. A subcommittee of the Rivers and Harbors Committee was appointed to consider the proposition submitted by the plaintiff and to this subcommittee the plaintff again submitted his original bid, this time in writing, accompanied by a bond for the faithful performance of the work. The subcommittee declined to accept the plaintiff’s proposition, expressing, however, a willingness to consider his proposed plan and their desire to give it a trial. To this end they recommended an appropriation for removing certain other improvements theretofore placed in the channel which interfered with the contemplated action of the plaintiff’s patented jetty, and for the removal of which the plaintiff had submitted an estimated expense of $50,000. On March 3, 1899, 30 Stat., 1128, Congress appropriated $60,000 for dredging and improving Aransas Pass Harbor. The Secretary of War, by the terms of this statute, was to expend said sum under certain specified conditions, one of which was for the removal of the so-called “ Mansfield Jetty,” and the other prohibited any expenditure until after the release and surrender of all rights and privileges theretofore acquired by the Aransas Pass Harbor Co. under previous acts of Congress. The harbor company executed the proper releases and conveyed to the United States all of its franchises and property rights whatsoever theretofore acquired by it. The plaintiff in writing notified the harbor company that his license to it for the free use of his patent was not transferable; he likewise notified Clarke & Co., as well as the committees of both the House and Senate on rivers and harbors. On June 13, 1902, Congress appropriated $250,000 to continue the Aransas Pass improvements. This statute provided in terms for a continuation of the work under the plans adopted by the Aransas Pass Harbor Co. and for the removal of the “Mansfield Jetty.” Previous to *600 the passage of the foregoing enactment the plaintiff appeared before the House Committee on Rivers and Harbors and renewed his attempt to'procure a contract for the completion of the harbor work. On this occasion his offer was reduced to $500,000. The offer was declined by both the House and Senate committees. The Assistant Chief of Engineers of the Army was personally before the Senate committee and protested against awarding the contract for improvement to any private contractor, on the same occasion stating, “that if it was desirous of testing the Haupt patent he would be glad to give it a fair trial.”
The plaintiff in proffering his bid for the work expressly stated in each instance that if awarded the contract no claim for royalty for the use of his patented jetty would be made, and if not so awarded he “ would expect something for the work of development and the use of the patent.” On April 20, 1903, the United States made a contract with Henry C. Ripley for construction work on said jetty. The plans, drawings, and specifications followed by Ripley were first prepared by the Government engineer in charge of the work, after which they were submitted to the Aransas Pass Harbor Co. and by it to their consulting engineers, one of whom was the plaintiff himself. The plaintiff suggested amendments to the specifications which were adopted and brought the same within substantial compliance with his modified original plans and drawings. The plaintiff was personally interested in the Ripley contract; he furnished financial assistance to Ripley, and was to share in the profits of Ripley’s contract.
Congress in 1905, 33 Stat., 1180, appropriated $100,000 additional and authorized contracts to the extent of $100,000 more for the continuation and completion of the project in accordance with the design and specifications of the Aransas Pass Harbor Co., and under contract with Clarke & Co., pursuant thereto, the jetty was finally completed in March, 1906.
By the act of March 2,1907, 34 Stat., 1091, Congress, upon the recommendation of a special board of engineers authorized by it, provided for changing the project into a twin-jetty project, which was done by the War Department, the *601 change being made between 'March, 1908, and April, 1911, the Army engineers, under revised plans of the department, adding somewhat to the length of the south jetty in 1915.
Upon the first presentation of the case the court was under the impression that plaintiff’s contention was predicated wholly upon the existence of an express contract, and relying upon that view of the case decided it accordingly. The case is now here on a motion for a new trial and to amend the findings, the plaintiff now insisting upon a decision respecting all features of the case; whether the same involves either express or an implied contract upon the part of the defendants to pay for the alleged use of the patented device. We believe that the plaintiff is clearly within his rights in so contending, and again enter upon a discussion of the case from every possible viewpoint going to the jurisdiction of the court to hear and determine the issues. In so far as any right to pay is alleged to flow from an express contract, we believe the issue clearly determinable adversely to plaintiff’s contention. Whatever contract, if any at all, whether express or implied, must rest upon the plaintiff’s representations to the committees of Congress and the subsequent expressions of that legislative body found in public statutes. Granting arguendo that a contract in any event could be implied under such a state of facts, then the court must gather from this particular congressional record, and this record alone, the fact as to the meeting of the minds of the parties engaged in the transaction, supplemented of course by the pertinent transactions of the plaintiff with strangers to the present litigation, i. e., contractors engaged by the defendants to perform the work involving the alleged use of the patented jetty. In order to bind the defendants the proof must directly connect them with the use of the patented device, and in such a positive way as to show a recognition of title in the plaintiff to the patent, and its use by them under such circumstances as to indicate an intention to pay for the same. Berdan Fire Arms Co. v. United States, 156 U. S., 552; United States v. Societe Anonyme, etc., 224 U. S., 309.
The question of infringement is excluded from consideration because the cause of action arose prior to the passage of *602 the act of 1910, 36 Stat., 851. The defendants had no direct connection with the organization of the Aransas Pass Harbor Co. This company was the outgrowth of long years of effort to unite by a navigable channel the waters of Aransas Pass Bay and the Gulf of Mexico. It was in a way a private enterprise to accomplish a great public service and afforded the plaintiff a most excellent opportunity to test the efficiency of his patented device. The harbor company accepted the plaintiff’s license to use his patent and as modified by plaintiff proceeded to construct the jetty. Clarke & Co., subcontractors of the harbor company, continued to use the plaintiff’s patent and up to the time when Congress intervened by legislation to take over and complete the work of construction by appropriation of public funds a considerable portion of plaintiff’s alleged patented jetty had been constructed. Plaintiff’s personal appearance before the committees of Congress was as much in the character of a contractor as a patentee claiming rights under letters patent, and while it served to bring home to the committee knowledge of his alleged patent rights and the circumstances of the claimed use by other contractors, it likewise demonstrated the absolute unwillingness of the committee to positively and expressly accept with such full knowledge before them the plaintiff’s respective propositions. The only possible inference looking toward such an acceptance is found in the express provisions of the various appropriation acts directing the procedure of the work in accord with the plans adopted by the Aransas Pass Harbor Co. To adopt this inference as conclusive evidence of mutuality involves the necessity of excluding every other consideration of legislative intent, such as completing a partially constructed jetty and thereby economize in expense, as well as to disregard the express language of the laws which seem to make unmistakably certain the fact that a course directly contrary to plaintiff’s submitted propositions would be pursued. In the many cases involving the payment of compensation for the use of a patented device resting upon the implication of a contract so to do, it is the invariable rule that the circumstances of the user must be such as to disclose the elements *603 of mutuality indispensable to the making of a contract, a use of the patent in such a way as to warrant the court in indulging an inference that compensation for so doing was to be paid. The plaintiff in this case made his direct and positive propositions. It is true he notified the committee that if they declined he would expect compensation for the use of his patent; nevertheless the legislation which followed failed to include or mention the very essential contentions put forward by the plaintiff while the acts were under consideration.
We have discussed the case thus far upon the assumption that an implied agreement might arise upon the proceedings had before the committees of Congress. In our view of the matter we might well rest the case upon the facts developed in this respect. Congress may by law make contracts; at least it has been so held in Indian cases, United States v. Mille Lac Indians, 229 U. S., 498; and if the act of Congress reflects the agreement made by its duly authorized committee we can see no legal impediment in considering the proceedings of the committee to ascertain its intent. The act, of course, speaks for itself, and we are unable from any of its express provisions to deduce that intendment indispensable to the establishment of contractual relations. The mere fact that Congress directed the work to proceed in accord with the plans adopted by the Aransas Pass Harbor Co., to whom plaintiff had granted a free license to use his patent, is obviously too conjectural upon which to rest a contractual obligation to pay compensation for the completion of the identical structure the plaintiff had willingly granted for nothing, and which the grantee had failed in part to construct. The Aransas Pass Harbor Co. assigned to the defendants all its rights and franchises, and while the plaintiff protested against the inclusion of his granted license, it would be impossible under any circumstances to imply a contract for more than the completion of the work performed by the company.
An examination of acts of Congress construed as making contracts with outside parties discloses the use by Congress of contractual language, and usually, if not uniformly, leaves the question of acceptance open as in cases of individual negotiation. The language of the acts is not left open *604 to doubt, and the statute itself left free from ambiguity in this respect. Some recitation, some positive recognition of the subject matter of the contract appears and is set forth in such a clear and unmistakable way as to leave no doubt that Congress intends by the enactment of the statute to enter into a contract with respect to the very subject matter for which compensation can be claimed. It is unusual to predicate a suit upon inferences from the express language of a statute and necessarily involves the deduction of conclusions from a positive enactment always doubtful and depending for support upon the consideration of innumerable events outside of and totally disconnected from the usual procedure of legislative bodies. In this very case we find repeated appropriation acts authorizing the expenditure of vast sums of money in aid of navigation, appropriations to complete a work of great public importance involving the highest skill of engineers, a work carefully considered by Congress for a long term of years and no specific mention of plaintiff’s device, no language from which the court may infer an intent to make a contract with an inventor to use a patent right, which admittedly they knew about, except the mandatory provision to proceed in accord with the plans adopted by the original parties who initiated the construction of dikes and jetties to perform the designed purposes. Why would Congress withhold appropriations from the plaintiff, and leave it doubtful as to his right to receive any portions of the vast sums set aside for this very purpose, if they intended to recognize his patent and pay him for its use? Congress had the matter before them, the plaintiff was there in person, every detail of the enterprise was before the committees, and it seems almost incredible that private rights, rights of extreme financial importance to the plaintiff, would be left for determination by the courts when a simple appropriation would have cleared all doubt and covered all individual rights.
The defendants took up the work of construction where the company left it, and the appropriation acts import nothing more than an intention to avail themselves of the construction work theretofore performed by the failing company, an intent to prevent another effort de novo.
*605 We have made the findings in detail. This course was the only one open to the court, notwithstanding the case must be dismissed for want of jurisdiction. The findings must show the completed transaction for a correct understanding of our conclusions.
The motions for a new trial and to amend the findings will be allowed in part and overruled in part, the former opinion will be withdrawn, and a new opinion filed dismissing the petition for want of jurisdiction. It is so ordered.
Hay, Judge; Dowmr, Judge; BaRNey, Judge; and Campbell, Chief Justice, concur.