Booth, Judge,,
delivered the opinion of the court:
This is a patent case. The plaintiff sues in his individual capacity. The transaction out of which the litigation arises had its inception in contracts made by the William A. Zeidler Company, a New York corporation, of which the plaintiff was the president and active managing and business director. A short time after the United States became involved in the war the Ordnance Department of the Government adopted the French type of ammunition. In conference with the French Commission it was decided to follow this course, and the department immediately altered. *548 existing contracts with American munition makers to this effect. One type of detonating shells employed as its principal functioning element a device identified in the record as Mark III fuse. A Mark III fuse is of metallic substance, circular in form, of smaller dimensions than the body of the shell to which it is attached, and serves the extremely important purpose of igniting the charge in the shell when it comes in contact with some object in its flight through the air, or strikes the ground when its flight is spent. The fuse itself is screwed into position at the pointed end of the shell, and the igniting portion of the fuse is brought into play by sharp and sudden contact or blow from the firing pin, much in the same manner as the hammer of a gun or revolver, the firing pin’s contact being directly upon a percussion cap inside the fuse. When this explosion occurs it serves to ignite the detonating device in the shell itself, resulting in its complete disintegration and releasing the deadly charge contained therein.
The firing pin is obviously of primary importance. To function at all it must be fitted into the pointed end of the fuse a fixed distance forward from the percussion cap and so adjusted as to readily move backwards when the shell is arrested in its flight by any obstruction. This sliding movement of the firing pin renders the handling as well as the loading and discharge of the shell from the gun a hazardous undertaking. Without a safety device to retain the firing pin in its forward position until the shell is discharged from the gun, those charged with handling the shell are constantly menaced by a premature explosion, as comparatively slight pressure moves the firing pin backwards against the percussion cap. In fact, so great is the danger that no one would contemplate the manufacture of the shell without a safety device. The safety device is an ingenious little mechanism known as a spiral, placed in position around the firing pin, fitting snugly between the button head of the firing pin and the edge of the orifice through which the latter slides in its backward course toward the percussion cap. It is composed of two elements, a strip of flexible tape rolled to extreme thinness and wound around two half rings or “ spacer elements ” made of hard material. The outer end *549 of the tape is weighted, and this weighted end curved so as to fit snugly the curvature of the spiral itself. The purpose of the weighted end is also of extreme importance. When the shell is fired from the gun a rotary motion is imparted to it by the bore of the gun. After it leaves the gun the rotary motion continues, thus setting up centrifugal force which, acting upon the "weighted end of the tape, tangentially unwinds it, frees the two half rings from their position, and the entire mechanism falls to the ground, leaving the firing pin free to function when it strikes an obstacle. It is the spiral and the manufacture of the same which results in this case.
The William A. Zeidler Company entered into its first contract with the International Steel & Ordnance Company, a subsidiary of the T. A. Gillespie Company, on November 26, 1917, to manufacture and deliver 1,400,000 spirals. Neither the Zeidler Company nor the plaintiff had theretofore manufactured a spiral and did not know what one was. The French commission furnished to the Ordnance Department of the Government detailed plans and specifications of the French type of spiral, a type that had been used successfully in France, and millions of them had been made abroad. In the various contracts which the Government had made with its munition contractors for the manufacture of the French fuse Mark III it was expressly covenanted and agreed that the French type was to be followed. The International Steel & Ordnance Company, among many others, had a contract with the Government to supply a large number of Mark III fuses, and this company entered into a subcontract with the William A. Zeidler Company to make for it 1,400,000 of the French type of spirals for $35.00 per M. William A. Zeidler personally negotiated and executed for his company this contract, as well as all others. He personally began preparations to make the French spirals, mapped out the details of manufacture, and, as an experienced and capable machinist and mechanic, succeeded in manufacturing a number of the same. In the process of manufacture the plaintiff. soon discovered that if required to furnish the French type of spiral in all its details he was bound to a losing contract, so he set about to vary the proc *550 ess of manufacture, cheapen production, and realize a profit. All this he accomplished, and with regard to which we will have more to say later on. He designed a modified type of the French spiral, submitted it to the International Steel & Ordnance Company for approval and substitution for the French type. The International Company submitted it to the inspector for the Ordnance Department, resulting in a test and approval of the spiral and its substitution for the French type. Later on the plaintiff again varied the detail of manufacture, and this second type of spiral, produced at a less cost, met a favorable approval and was made and sold extensively by the Zeidler Company, the record disclosing the fact that up to April 20, 1918, the Zeidler Company had written contracts with various government contractors to manufacture 3,665,000 spirals, including both of the plaintiff’s designs, the number of each design not being ascertainable. April 24, 1918, the plaintiff filed in the Patent Office separate applications for patents covering both types of spirals he had designed. The applications were numbered 1368981 and 1366148. Number 1368981 is primarily involved in this case, number 1366148 being the subject of a separate case in infringement.
The- act of October 6, 1917, 40 Stat. 394, provides as follows:
“That whenever_ during a time when the United States is at war the publication of an invention by the granting of a patent might, in the opinion of the Commissioner of Patents, be detrimental to the public safety or defense or might assist the enemy or endanger the successful prosecution of the war he may order that the invention be kept secret and withhold the grant of a patent until the termination of the war: Provided, That the invention disclosed in the application for said patent may be held abandoned upon it being established before or by the commissioner that in violation of said order said invention has been published or that an application for a patent therefor has been filed in a foreign country by the inventor or his assigns or legal representatives, without the consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law.
“ When an applicant whose patent is withheld as herein .provided and who faithfully obeys the order of the Commissioner of Patents above referred to shall tender his in *551 vention to the Government of the United States for its use, he shall, if and when he ultimately received a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government.”
On June 3, 1918, the plaintiff received from the Commissioner of Patents the following official communication:
Patent Office, June 7, 1918. Mailed
Serial No. 230545. Piled April 24, 1918. Por spirals for shells.
By William A. Zeidler, assignee
DEPARTMENT OE THE INTERIOR,
United States Patent Oeeice,

.Washington, June 8, 1918.

William A. Zeidler,

Gave of Frank J. Kent, 271 Broadway', New York, N. Y.

NOTICE AND ORDER

To William A. Zeidler, his assignees, his heirs, and any and all his agents:

Under the provisions of the act of October 6, 1917, (Public No. 80; 243 O. G. —, 797), you are hereby notified that your application as above identified has been found to contain subject matter which might be detrimental to the public safety or assist the enemy in the present war, and you are hereby ordered to in nowise publish the invention or disclose the subject matter of said application, except that the invention may be disclosed to officials of the War and Navy Departments of the United States, but to keep the same secret during the period of the present war (unless by written permission first obtained of the Commissioner of Patents), under the penalty of the patent being held abandoned: This application must be prosecuted under the rules of practice until a notice is received from the office that the case is in condition for allowance. Such notice closes the prosecution of the case, except under provisions similar to those set forth in Rule 78. Furthermore, if previously allowed and now withdrawn, the prosecution of the case is likewise closed. When the application is in condition for allowance it will be withheld from issue during the period of the war.
Your attention is also called to the provisions of section 16 of the trading with the enemy act of October 6, 1917 (Pub. No. 91).
*552 This order should not be construed in any way to mean that the Government has adopted or contemplates adoption of the alleged invention disclosed in this application, nor is this order any indication of the value of such invention.
J. T. Newton, Commissioner.
Thereafter, on January 7, 1919, the commissioner’s order of secrecy was rescinded, his application favorably considered, and letters patent duty granted on February 15, 1921, #1368981.
The contract for the payment of royalties by the defendant is deduced arguendo from this state of facts. The jffain-tiff contends that compliance with and strict observance of the terms of the act of October 6, 1917, is the equivalent of an offer and acceptance and of itself constitutes a contract to pay compensation for a patented device subjected to the provisions of the law.
Predicating his case upon the statute, the plaintiff insists upon the right to recover a royalty of one cent upon each spiral used by Government contractors, whether the same were manufactured and delivered in pursuance of the contracts existing between the Zeidler Company and Gov-, ernment contractors, or made and furnished by outside contractors, his claim being that the act of October 6, 1917, and his strict observance thereof constitute by the very terms of the statute an express contract, and not only authorizes a recovery of a royalty for the use of each type of spiral covered by his letters patent, but a similar royalty for the use of all additional spirals manufactured by others which fall within certain claims of his Letters Patent No. 1368981.
It did not require the act of October 6, 1917, to render the United States liable for the use of a’ patented device either under an express or implied contract. United States v. Berdan Fire-Arms Co., 156 U. S. 552; United States v. Harvey Steel Co., 196 U. S. 310. The act of June 25, 1910, 36 Stat. 851, as amended by the act of July 1, 1918, 40 Stat. 705, enlarged the jurisdiction of this court, extending the same to infringement cases, so that as a remedial statute the act of October 6,1917, with respect to the creation of governmental liability arising ex contractu was in line with the then existing law and followed established precedents. The act of Oc *553 tober 6, 1917, expressly required a “ tender ” and a subsequent “ use ” by the Government before the right to sue for compensation attached. Manifestly, when a patented device is tendered for use and is thereafter used, without claim of right upon the part of the Government to use, a corresponding liability to pay for such use arises. This has been the established rule of law for a long period of time and was the state of the law when the act of October 6, 1917, came into being. Soeiété, etc. v. United States, 224 U. S. 309. The act of October 6, 1917, a war measure, was obviously not intended to hold the Government responsible for the use of a patented device in the absence of an express or implied contract to pay for such use. Its terms expressly so state. What it did do was to extend a wholesome and just protection to prospective inventors by saving to them a right to sue for compensation for the use of their patents when letters patent were finally issued, and recover compensation from the date of user instead of from the date of letters patent. The war necessitated secrecy. The Commissioner of Patents was given discretion to enforce secrecy, and he could only discover from the application for patent when the necessity for the exercise of his discretion was essential. Having made the discovery and exercised his discretion, the issuance of the letters patent was positively suspended. The established process of procedure being thus arrested and the inventor’s rights suspended, the inventor might still tender his patent to the Government for usé— i. e., disclose his application to the full extent — and with matters in this inchoate condition not lose his right to sue and recover compensation for its use, if it was used, to the same extent as if he had letters patent at the time of user. In other words, the law saved to the inventor all rights and privileges which might have resulted disastrously to any claim for compensation by reason of its passage without this saving clause. It is difficult for us to conceive that more was intended. The right to sue for compensation is not usually construed as the equivalent of the grant of compensation. If Congress intended to foreclose the Government from defending said suits upon the basis of any available legal defense and set up a liability as upon an express contract, *554 thereby depriving the Government of the right to challenge the validity of the patent, express words to that effect should have been used; for it must be admitted that to so hold involves an inference from the language used. Why should the Government estop itself from resorting to legitimate defenses at a time when prospective inventors were extremely active and insufficient time prevailed to investigate with care and caution the exact legal status of the situation? The mere fact that the statute in question provided as it did is sufficient in itself to warrant the conclusion that Congress intended no more than to protect prospective inventors as well as itself under the emergencies of the time and extend to inventors a right to litigate the issue when the emergency passed and the processes of the Patent Office functioned normally. Neither party affected was to lose rights because of the interposition of the law.
As a matter of fact, the plaintiff has not brought his case within the terms of the act of October 6, 1917. He did not keep his application secret nor pretend to do so. As previously observed, the Zeidler Company, to whom he first disclosed his patent in every feature, and the company for whom he personally made.the alleged patent, and the company which manufactured the same under his personal supervision and inspection, manufactured, delivered, and received pay for 3,665,000- spirals made in exact accord with one or the other of his subsequent patents. Surely his disclosure to the Zeidler Company before a tender to the Government was not what the statute required. The Zeidler Company prior to plaintiff’s application for a patent entered into at least three separate contracts with three distinct munition makers, agreeing to furnish spirals in large quantities, and did so furnish them, the plaintiff himself negotiating and executing each one of the contracts. The plaintiff exploited the sale of his devices to the fullest extent and received pay therefor. Even after he filed his application for patent the Zeidler Company, a corporation, from whom he may not divorce himself personally, manufactured, sold, and received pay for 3,800,750 spirals of one form or another, sold to at least four separate Government contractors, of whom his company was a subcontractor for the supplying of spirals. The *555 record clearly discloses that the plaintiff, acting for his company, was willing and anxious to manufacture spirals of his design for anyone in need thereof without any solicitation or direct permission of the Government so to do. The plaintiff accomplishes his tender of the patented article to the Government by insisting that its acceptance and approval by Government inspectors charged with the duty of inspecting and supervising Government contracts with munition makers was the equivalent of a direct tender to the Government itself; that the inspector, having put the spiral to the test, and afterwards permitted their substitution for the French type, was in legal effect a tender to the Government and a use' by the Government. No direct tender to the Government through any of its departments, especially the Ordnance Department, or any other official is shown. The plaintiff’s sole customers were the Government and munition makers under contract with the Government. The Government in its contracts with munition makers specified the French type of spiral, an efficient mechanism, for the use of which the Government was under no liability to pay.
The plaintiff, acting for the Zeidler Company, agrees under a subcontract to manufacture for Government contractors the French type of spirals. He admittedly finds it to the advantage of his company to vary the detail of the French type and cheapen production. Application is made by the subcontractor to the prime contractor to substitute this device, thus varied for the precise requirements of the French spiral. The Government contractors take the matter up with the Government inspector, and after test the substitution is allowed and the Government agrees to accept from its individual contractors fuses with the substitute device attached. Until the Government contractors at the personal solicitation and direct permission of the plaintiff applied for the right to use the substituted device, the Government had never heard of or considered the plaintiff’s spirals and then did not acquire knowledge through any act of the plaintiff. There was no privity of contract between the plaintiff and the Government. The Government’s attitude was permissive. The Government’s contractors were liable to pay and did pay for the use of the spirals, a direct *556 liability running from them to the plaintiff’s company. Singular, indeed, that the act of the Government, granting arguendo the authority to substitute, permitting the substitution by a subcontractor of one thing for another he was obligated to furnish, would impose upon the Government a substantial liability to pay for the substitute, when under express contracts no liability to pay for a workable and practicable device of the same nature obtained.
The usual course of dealing in cases of this sort is for the inventor to tender his patent directly to the Government through the appropriate department and solicit its substitution or use by the Government by specifying such a use in Government contracts. The method chosen by the plaintiff was, to say the least, most circuitous. First disclosing his patent to the Zeidler Company and then to the company’s prime contractor, and through their intervention receiving governmental approval to substitute the same in Government contracts is manifestly too indirect to warrant a conclusion that the plaintiff, acting for himself, really tendered or intended to tender the same to the Government. In its broadest aspect the tender was not made by the plaintiff but by the Zeidler Company, and the Zeidler Company, as well as the other Government contractors to whom the plaintiff’s alleged patents were sold, acquired beyond doubt an absolute license to use the same and to sell them to whom they pleased. Keeler v. Standard Folding Bed Co., 151 U. S. 659; Bauer & Cie. v. O’Donnell, 229 U. S. 1.
The plaintiff’s relationship to the Zeidler Company brought home to him personally positive knowledge of the manufacture and sale of every spiral made by that company. He knew exactly and to the minutest detail everything the company did with regard to spirals. Obviously he may not stand silently by and permit such an extensive user of his devices, participate to the largest extent in the profits which accrue from such use, and escape the consequences of his acquiescence in the proceedings. We need not refer to authorities sustaining the rule that a license to use a patented device may be implied from conduct as *557 well as granted by words or contracts. Surely Congress did not intend, as the result of a judgment in this case discloses, to reward a patentee with double profits for the use of his invention. If the plaintiff recovers he retains the profits made by the Zeidler Company, in which he was the owner of a majority of the stock, for these identical spirals as well as all other gains accruing from the additional advantage of a 1 cent royalty amounting, as he claims, to $150,000. He sets up a claim individually seeking compensation in a large part, at least, for what he did as the only and active manager of a corporation which in realty; he owned and controlled. A few shares of the Zeidler Company stock were owned by others, among them the plaintiff’s wife; the remainder belonged to the plaintiff. Manifestly one may not personally engage in an enterprise of such proportions and then seek immunity from the legal results which follow from personal knowledge of what was going on.
As to the vast number of spirals made by other manufacturers and furnished to Government contractors coming within the claims of his patent No. 1368981, we believe the claim without merit. The petition alleges that this entire number comes within all the claims of his patent, and particularly within claims 1, 2, 3, 4, 5, 6, 7, 8, 9, and 10 thereof. Whatever of real invention pertains to plaintiff’s claims is centered exclusively in the weighted end of the spiral tape. Novelty is not claimed as to the other elements of the spiral. The French spiral was made by taking sheet metal of the thickness of the weighted end and reducing all but the weighted end by a process of rolling until sufficiently thin for “ the flexible or winding part of the spiral.” The weighted end was integral with the tape and was reduced to the proper curvature with the half rings by a milling process. The weighted end was the primary functioning element of the spiral. Upon it the successful operation of the device in the first instance absolutely depended. When the shell was discharged from the gun its intense rotary motion causes centrifugal force to act upon the weighted end, throwing it outwardly tangentially and un *558 winding the flexible tape which holds the two half rings in position, thus releasing the same and causing the whole device in all its parts to disintegrate and fall to the ground.
The indispensably essential thing in the manufacture of any spiral is the exactness of the dimensions. The details of manufacture to attain this end is clearly one of suggestion to one skilled in the art. The British type of spiral unwound, it is true, in the opposite direction from the French, but it embodied the elements and clearly disclosed the_ functioning idea of the French type. The British spiral was faulty, not because of inherent defects but due to lack of skill in manufacture. The French spiral overcame these difficulties. The plaintiff had never made and so far as the record discloses had never seen a spiral until he agreed to make the French type. He admits that he did and could make French spirals. Beyond doubt those he did make functioned satisfactorily. The expense of manufacture induced experimentations to reduce the same and substitute a profit for a loss. Plaintiff accomplished it by taking instead of sheet metal of the thickness of the weighted end, sheet metal of one-half the thickness of the weighted end, rolling down to prescribed thickness the flexible tape, extending the weighted end of one-half thickness about twice the length required for the weighted end, then folding this extended portion in the middle, doubling a part back upon the remainder, and holding the folds together by the introduction of a small rivet, thus saving about one-half the labor required in rolling the tape itself to its prescribed dimensions, and adding to the process of manufacture the folding and doubling of the weighted end. The weighted end of the Zeidler spiral must also be reduced to curvature by a mining process.
There is no claim, and clearly could be none, that the Zeidler patent facilitates the operation of the spiral. What is emphasized is that the French design was impracticable, could not be produced according to the French specifications given to contractors, and such spirals were not made until March, 1918, and then only after the plaintiff had given directions as to their manufacture. This position is untenable. The plaintiff made French spirals, and they operated successfully. France was in the war close to three years *559 before we became involved, and the French spiral by the millions were made and used in France. The plaintiff added nothing to the French spiral which changed in the slightest degree the operation of the same. He introduced no new element except a rivet to hold his folds in position, and obviously it was not an improvement. He gave nothing new to the art save a process of manufacture which enabled the production of spirals at a less expenditure of labor and material. His idea brought no new device into the art. To us it seems no more than seizing upon the essential elements of the French spiral and varying the detail of their unification to accomplish the predominating idea which the French spiral exemplified.
We have not gone more extensively into the claims of the patent and the specifications attached thereto. This will appear from the findings. The case depends exclusively upon the weighted end of the tape and is within a very narrow compass. In Smith v. Nichols, 21 Wall. 112, the court said:
“A patentable invention is a mental result, it must be new and shown to be of practical utility * * *. But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent.”
The petition will be dismissed. It is so ordered.
Geaham, Judge; Hat, Judge; DowNet, Judge; and Campbell, Ghief Justice, concur.