Ho wet, J.,
delivered the opinion of the court:
Plaintiff’s intestate was in 1896 appointed one of several commissioners to examine and classify lands within the land grant and indemnity land grant limits of the Northern Pacific Railroad, with special reference to the mineral or nonmineral character of said lands within the States of Montana and Idaho, under the provisions of an act of Congress approved February 28,1895 (28 Stat. L., 683), at a compensation of $10 for each day of actual employment if the same did not exceed $2,500 in any one year. On May 19, 1897, the Secretary of the Interior wrote to the intestate that to enable the latter to complete some of the work then on hand the furlough previously telegraphed to him was revoked and that he could continue on duty to the end of the fiscal year. Coupled with this letter was a. request for the commissioner’s resignation to take effect at the end of the fiscal year. Following this (June 2, 1897), the Commissioner of the General Land Office telegraphed plaintiff’s intestate as follows:
“Funds exhausted and your services discontinued.”
The receipt of this telegram was acknowledged by a statement from the deceased commissioner, whose interest is now represented by an administrator, that they had temporarily stored their field outfit pursuant to instructions contained in an official letter of the Secretary of the Interior of a former date, and that he would remain at that point subject to orders, prepared to again continue the actual discharge of the duties *142 of the office which he held. On July 1,1897, without further instructions, the commissioner again entered upon his duties, rendering the twenty-four days’ service for which compensation is now claimed. The nature of these duties appears bjT the reports set forth in the findings. No objection was made by any officer of the Interior Department during the time of the performance of this service.
On July 27, 1897, two of the mineral land commissioners (of whom plaintiff’s intestate was one) telegraphed to the Commissioner of the General Land Office that they had returned from the field, and inquiring if they should make and file their report of 85,000 acres of land stated to have been examined. The answer to this information and inquiry was a statement that their services were ordered discontinued June 2,1897.
Upon the presentation of an account for the services thus rendered in July by plaintiff’s intestate the Seeretaiy of the Interior disallowed the account on the ground that the mineral land' commissioners were all notified of the discontinuance of their services previous to the close of the preceding fiscal year and were never in any way authorized or directed by the Secretary or the Commissioner of the General Land Office to resume work July 1 or at any other time.
The determination of the matter at issue depends upon the effect to be given to the order discontinuing the services of the deceased commissioner.
The act under which the account was presented defined the duties of the commissioners by sundry provisions in the first and second sections, as follows:
“ That the Secretary of the Interior be, and is hereby, authorized and directed, as speedily as practicable, to cause all lands within the land districts hereinafter named in the States of Montana and Idaho within the land grant and indemnity land grant limits of the Northern Pacific Railroad Company, as defined by an act of Congress entitled ‘An act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound, on the Pacific coast, by the northern route,’ approved July second, eighteen hundred and sixty-four, and acts supplemental to and amendatory thereof, to be examined and classified by commissioners to be-appointed as hereinafter provided, with special reference to the mineral or nonmineral character of *143 such lands, and to reject, cancel, and disallow any and all claims or filings heretofore made, or which may hereafter be made, by or on behalf of the said Northern Pacific Bailroad Company on any lands in said land districts which upon examination shall be classified as provided in this act as mineral lands.”
The second section, after providing for the appointment by the President of commissioners for three districts in Montana and one district in Idaho and fixing the rate of compensation, provided that:
“Said commissioners shall make examination of the lands herein mentioned within their respective -districts, and may also take the testimony of witnesses as to the mineral or nonmineral character of any of said-lands, and receive any other evidence relating to said matter, and shall have power to summon witnesses to appear before them and to administer oaths; and they shall, immediately upon their appointment, proceed to examine and classify the lands herein mentioned within their 'respective districts, as provided in this act, and shall fully complete said classification within the term of four years from the date of this act. The oath of office of said commissioners shall be filed by them in the office of the Commissioner of the General Land Office. All testimony taken by said commissioners shall be reduced to writing, subscribed by the witnesses, and filed with the report of the commissioners hereinafter required. The action or decision of a majority of said commissioners in each district shall control in all matters herein provided for. That the commissioners shall perform the work of examination and classification herein directed according to such rules and regulations as the Secretary of the Interior shall prescribe.”
Becurring to the order attempting to discontinue the services of the commissioners, it will be observed that the appropriations for carrying into effect the act had all been used for that year. This was the sole reason assigned for the order of discontinuance, and is taken to be the true reason. But funds again became available on the 1st of July, 1897 (30 Stat. L., 37), and then it was that plaintiff’s intestate, without waiting for further instructions, resumed work and so continued until he received final information calling his attention to the previous notice that his services had been discontinued. A successor was subsequently appointed and confirmed under the act of June 4, 1897 (30 Stat. L., 38), and no question *144 arises growing out of the occupancy of the office or the discharge of the duties pertaining thereto by another person.
This successor, it may be observed in passing, was appointed under the mistaken idea that the commissioner for the Helena land district had resigned (Cong. Rec., July 22,1897, p. 3218, subtitle “Nominations”). This is noticed only for the necessity to say that no resignation was ever tendered or authorized to be tendered by or for this particular commissioner.
The Secretary of the Interior, by a communication in writing, revoked a previous telegraphic order for the discontinuance of the intestate’s services,..and gave him express authority to continue on duty to the end of the fiscal year. It is true there was in this communication a request for the intestate’s resignation at the end of that time, but as a resignation was not handed in, the intestate forfeited none of his rights, either because of his failure to resign or because of the request upon him to vacate the office. The subsequent telegram of the Commissioner of the General Land Office notifying the intestate that funds were exhausted necessarily meant that funds were exhausted for that fiscal year only. The intestate evidently interpreted this telegraphic order notifying him that the appropriation was exhausted -and discontinuing his services in advance of a resignation as referring to that part of the fiscal year when funds were not available for the work. The letter of the Secretary of the Interior and the telegram of the Commissioner of the General Land Office to the intestate must therefore be construed together. The two communications did not have the effect of removing the intestate from the office. And this is true even if the telegram of the Commissioner of the General Land Office be taken by itself.
With funds available and work yet to be done, and acting pursuant to the instructions of the Secretary, this commissioner not only had the right, but it was his duty, to continue to discharge the functions of his office so long as he was in commission for that purpose. The law under which he was appointed limited the time for the completion of the work and imposed the obligation for him to proceed immediately upon his appointment to examine and classify the lands. If, complying with the law and the obligation of his oath, and *145 funds being available to justify progress, the commissioner did the work in good faith, we think he is entitled to be paid. This is especially true under the facts disclosed by the findings. Weekly reports were transmitted in accordance with Department regulations of the work done as it progressed, and these reports were received and filed without protest or objection and without notice of any kind that the work must cease. Land was actually examined, and though some effort is made to show that the Department finally elected not to accept the classification by the first board of commissioners, of which the intestate was a member, this would not relieve the Government of the obligation to pay for work honestly done and performed under the law without protest or objection while it was being done, even if it be true that the work was not satisfactory. There is no evidence, however, that the work was not efficiently done or that any further examination and classification of the land became necessary. Acquiescence after the reports which supplied the means of knowledge of the progress of the work became, in any event, a recognition of such import the fact can not be ignored in determining the right and remedy of the case. It is a rule, both of law and equity, that when a parly by his silence seems to consent to a waiver of his right, and thereby misleads the other party, he is estopped from asserting the right. (Wehrman v. Conklin, 155 U. S. R., 314.) Estoppel is a doctrine not generally favored, but the law recognizes the necessity for its enforcement in many cases. The Government may perhaps maintain exemption from its application more successfully than individuals on the principle that no one is authorized to waive public rights without the authority of a statute. But even the Government may be estopped of a legal right (Eager v. United States, 33 C. Cls. R., 338), and in judicial proceedings and certain matters of executive administration the action of departments of the Government and its officers may be such as to preclude a defense involving so much of injustice as would result in this case if it be held that the defense should be sustained. Judgment will therefore be entered in plaintiff’s favor for the amount of the services which the findings show were rendered,