Booth, Chief Justice,
delivered the opinion of the court:
This patent case comes to the coui’t under the special jurisdictional act set forth in Finding 1. No jurisdictional issue is raised and hence it is not essential to repeat the terms of the act in this opinion, except to observe that the findings of fact, as well as the opinion of the court, shall be reported to Congress.
Plaintiff’s interest in aircraft bombs, the subject matter of the present case, originated from his experience with the revolutionary forces of Villa, and came about in the following way:
In 1914 plaintiff was in Mexico engaged in selling and installing tractors and while so engaged he joined the revolutionary forces of Villa. Observing the lack of an efficient air corps, and the absence of aircraft bombs, plaintiff sought to induce American pilots to join Villa’s forces and himself set about to supply aircraft bombs.
The bombs manufactured by him in Mexico were crude affairs and possessed operative defects due in a large meas- *417 ur& to bis inability to obtain suitable material and manufacturing facilities. In 1915 plaintiff returned to the United States and became 'an employee of the Glenn L. Martin Airplane Company in Los Angeles, California. This connection enabled him to continue his research and development work with respect to aircraft bombs and during his service with this company he constructed five or six of them.
In February 1916 plaintiff submitted to the Ordnance Department of the Army his then design of an aircraft bomb. This design interested the officials of the department, and they suggested to the plaintiff that he go over to the Frankfort Arsenal in Philadelphia where he could familiarize himself with Ordnance construction and practice.
Plaintiff as a civilian remained at the Frankfort Arsenal until August 1916. He had available to him the facilities of the same, including the use of machine tools and the assistance of mechanics in the experimental shop. During this time tests were conducted by the plaintiff, and Major Sliinkle and his staff advised with him. His design of a bomb and his tests interested the officials of the Arsenal.
Plaintiff was unquestionably an experienced and skilled mechanic; the findings so show. His interest, skill, and industry were centered upon the inventions for which he secured letters patent. On May 20, 1916, while at Frankfort Arsenal, he filed his first application, serial number 98737, which subsequently matured into patent #1322083 issued November 18, 1919, for what he designates as a “drop bomb.” The patent was issued to the Marlin Arms Corporation, plaintiff’s assignee.
The officials of the Oi’dnance Department suggested to plaintiff that it would be advisable for him to obtain relationship with some active manufacturer of ordnance and thereby procure the manufacture of his designed bombs. The suggestion was accepted and in January 1917 he connected himself with the Marlin Arms Corporation of New Haven, Connecticut.
Prior to going to New Haven, plaintiff had on August 20, 1916, filed his second application for a patent which like the former one matured into an issued patent on September *418 80, 1919, to the Marlin Arms Corporation. Plaintiff’s relationship with the Marlin Arms Corporation, afterwards known bj a change of name only as the Marlin-Rockwell Corporation, involved an assignment of his patents to it.
August 3, 1917, the Marlin Arms Corporation entered into the license agreement (Finding 10) with the Chief of Ordnance of the Army. The defendant ascribes determinative importance to this agreement, insisting that under its provisions the United States was licensed to manufacture the aircraft bombs it did manufacture, and that plaintiff’s only remedy in this case arises out of this license agreement. The argument advanced is predicated upon article 2 of the agreement.
Several articles of the agreement are involved in the discussion of this issue and should be quoted, as follows:
Article 2. It is further agreed that in consideration of the assistance rendered by the Ordnance Department, United States Army, in the development of the drop bomb referred to herein, and of the royalty to be paid as set forth in article 1 of' this contract, the Ordnance Department, United States Army, shall have the right, without the payment of any additional sum, to manufacture, to have manufactured, to use and to sell, drop bombs possessing such, improvements of any of the features covered by the application for letters patent specified in article 1 of this contract as may be covered by applications hereafter allowed the contractor by the United States Patent Office. [Italics ours.]
Article 5. It is further agreed that the Ordnance Department, United States Army, shall furnish the said contractor, on or before the first days of January and July of each year during the life of the patent covered by the application specified in Article 1 hereof, a statement showing the number of all complete drop bombs, either loaded or unloaded, embodying any or all of the features covered by the application for letters-patent specified in Article 1 hereof, which drop bombs have been ordered manufactured, either in Government or private establishments, during the preceding six months, and, on or about the same dates, prepare vouchers for the contractor, to cover the amount due it as royalty on the drop bombs so ordered manufactured.
Article 10. If any doubts or disputes shall arise as to the meaning of anything in this contract the matter shall be referred to the Chief of Ordnance, United States Army, for determination. If, however, the contractor shall feel *419 aggrieved at any decision of the Chief of Ordnance, he shall have the right to submit the same to the Secretary of War,, whose decision shall be final.
The language of the license agreement is not ambiguous. The intent of the document is evident from its provisions. The plaintiff, Barlow, had pending in the Patent Office two-applications for bomb patents; the claims of the same had been allowed but the letters patent had not issued. The Ordnance Department of the Army had assisted the patentee,, and was conspicuously his best and most available customer. Therefore, it was to the interest of Marlin Arms Corporation financially and otherwise to have the license agreement entered into, and on the date of its execution the agreement comprehended all patent applications filed by the patentee.
Article 2 of the agreement clearly grants to the United States a license in accord with the terms of Article 1 to use, manufacture, or have manufactured bombs covered by future patents which possess improvements of any of the features covered by the patent application mentioned in Article 1. What the parties intended by Article 2 was,, in consideration of the royalties to be paid and the assistance rendered the patentee in developing his bomb, to grant to the United States the right to avail itself of the use or manufacture of aircraft bombs which the patentee might in the future develop and patent. The license agreement evidences the fact that plaintiff had accomplished an advanced-step in the art, and the Ordnance Department of the Army in an appropriate agreement wished to be in a position to obtain the advantages which might accrue in the future.
The plaintiff challenges the pertinency of the license agreement to this case. The rule of estoppel is invoked. Article 5 of the agreement is cited as sustaining the rule and provides in terms that the Ordnance Department of the Army will semi-annually furnish the licensor with detailed statements showing the number of bombs manufactured either by or for it, and pay the royalties prescribed in the license agreement.
The rule of estoppel is not ordinarily applicable to the Government. Several cases, which we need not cite, have-sustained a contention that the Government is estopped to *420 plead a defense held by courts of record to have been unavailing in litigation between the same parties. In ordinary transactions, however, such as we have here, the failure •of Government officials to observe express contractual obligations constitutes a breach of the contract, subjecting the Government to a suit in this court for the recovery of damages. Knight v. United States, 35 C. Cls. 129, 145; Hartson v. United States, 21 C. Cls. 451.
If the Government officials charged with the duty of observing article 5 of the agreement did not observe it, and evidence is produced that the Government manufactured or caused to be manufactured aircraft bombs falling within the terms of the agreement, the remedy we have noted above existed and continues to exist under the special jurisdictional act, notwithstanding the nature of the pleadings in this case.
The license agreement of April 3, 1917, is a part of the record in this case. The court may not ignore it. It is established that a specific number of bombs were manufactured by the Marlin-Bockwell Corporation for the Government during the war under a separate and independent contract and for a consideration different from the one specified in the license agreement. This fact, however, does not of itself set aside the license agreement. If the parties in one or more instances agree independently of the license agreement to manufacture a certain number of bombs and neither insists upon the payment of the fixed royalties, the agreement embracing a continued relationship is not, we think, abrogated.
The special jurisdictional act under which this litigation proceeds is comprehensive in its terms. The statute of limitations, as well as Section 3477 of the Bevised Statutes, is waived, and Congress clearly intended to extend to plaintiff a right to assert, his claims in this court free from the interposition of the defenses waived. Therefore it is manifest that if the patents involved herein fall within Article 2 of the license agreement, i. e., if the patents possess improvements of any of the features covered by letters patent #1322083, the rights of the parties with respect to compensation are fixed by the same.
*421 Much is said as to the meaning of the words “possessing such improvements of any of the features covered by the application for letters patent specified in Article 1 of this contract.” It is fundamental that patents are granted for what may be termed novel and new features. Letters patent #1322083, the patent mentioned in Article 1 of the agreement, must of necessity speak for itself. The claims of the-patentee are important factors, and by resorting to the specifications and claims the duty is cast upon the court to determine the scope of the patent and the novelty which resides therein.
The plaintiff insists that patents #1322083 and #1311608,. mentioned in the license agreement, are isolated by their specifications and claims from the patents upon which this suit is predicated. If this is true then the case rests squarely upon the act of October 6,1911, known as the “Trading with the Enemy Act”, with respect to which later comment is essential. It follows as a matter of course that if the six patents in suit do not cover improvements to the two foregoing patents, the license agreement is not applicable.
Patent #1322083 issued to plaintiff November 18, 1919, upon an application filed May 20, 1916, contains nineteen claims. Findings 11 and 12 disclose by illustrations and in detail the subject matter of the two patents. In this connection it is pertinent to state that aircraft 'bombs must of necessity possess characteristics essentially different in many respects from what is known by common designation as an ordinary bomb, i. e., an explosive missile which does not depend upon operativeness in the same way an aircraft bomb does.
An aircraft bomb, being essentially a highly explosive projectile, must be safe against premature explosion until it is set in motion towards its objective. It has to be transported on the body of an airplane, frequently in close proximity to the enemy, as well as the pilot of the plane, and subject to rifle and machine-gun fire. In addition to this, such a bomb attached to an airplane should be rendered immune from explosion in the event of a forced landing or crash of the plane and so constructed that it may, in eases of emergency, be discharged or dropped without explosion in *422 order to lighten the load of the plane when flying over friendly territory. These features, as well as the inherent quality of destructiveness when exploded, form integral characteristics of an aircraft bomb.
The plaintiff, as his patents evidence, comprehended from both a scientific and practical knowledge the essential elements of an operative aircraft bomb. He directed his efforts, so far as patent #1322083 is concerned, toward the creation of what he terms a “drop bomb” which possessed the elements of safety mentioned and in addition sought to overcome the hazard of a failure to explode when contacted with its objective.
Bombs as such were admittedly old in the art and the elements essential to their operativeness were well known. Inventors in advance of plaintiff knew, and it was well known, that a bomb embodied the employment of a highly explosive material, i. e., TNT, which was exploded by means of a detonator coming in contact with what is known as the booster charge or chamber, the latter when fired exploding the main charge of TNT carried by the bomb.
The problem plaintiff intended to solve was to so arrange and coordinate these well known elements of a bomb as to bring about safety in their employment, improve the accuracy of their operativeness, and forestall to the extent possible their failure to accomplish their designed purpose. Frequently an aircraft bomb would be released from the plane and, when it came in contact with the earth, either fail to explode or bury itself in the earth’s surface without accomplishing the purpose of its release.
Before entering upon a discussion of whether the plaintiff’s patents in suit possess improvements of any of the features covered by the applications for patents mentioned •in the license agreement, attention must be called to the fact that the license agreement grants rights co-extensive with “any or all of the features covered by and described in ■application for letters-patent #98737 filed May 20, 1916.” This same language appears in Article 4. Therefore it is apparent that the granted license may upon proofs submitted obtain a broader scope than it would otherwise if limited to the claims of the patents.
*423 'So far as the present record exhibits, patent #18-22083 discloses — without going into detail — a type of aircraft bomb where the primary object, as stated by the inventor, is to formulate a type of bomb construction “which will be exploded with certainty at a predetermined distance above the ground or other target.” To accomplish the same, the inventor provided a device similar in contour to a gun barrel, designated as an extruding member, capable of being armed at the proper moment, which assumed a position in advance of the explosive head of the bomb and operated in conjunction with other elements to cause the bomb to explode when the extruding member contacted the objective.
The extruding member functioned to not only propel a bullet inwardly which contacted the detonator causing it in turn by its own explosion to explode the booster charge which exploded the TNT in the explosive head of the bomb, the extruding member functioning to maintain the bomb at the moment of explosion a predetermined distance above ground.
In addition to the above particular feature of the invention, structural features were also described and claimed as designed and intended to produce the instantaneous and certain operation of the device, and prevent the accidental discharge of the same by gunfire directed against the airplane from outside sources. Figs. 1 and 2 in Finding 11 accurately disclose the structural features described.
It is sufficient to say, without repeating what is said in Finding 11, that the ingenious structural features set forth in the patent specifications functioned to not only secure the operativeness of the extruding member but by locating the detonator in the tail of the bomb, an obviously safe position to prevent premature explosions and causing it to move forwardly into contact with the booster charge after the bomb had been released from the airplane, accomplished the inventor’s intended purposes.
Bombs, as we have observed, were old. Booster charges, detonators, and the additional elements essential to arm and explode them, were old. The field of invention with respect to these particular elements was limited by the prior art. Airplane bombs comprehended the use of all of these old *424 elements. The problem confronting inventors in the art was one of adapting them by new and novel combinations in such a way as to produce an operative and useful airplane bomb, and this is precisely what the plaintiff did.
We will not encumber this opinion with the citation of the numerous cases which uniformly hold that a new and novel combination of elements old in the art which produces a new and better result involves invention and is patentable. The importance of an understanding of the scope of the application for an issued patent #1322083 resides in the fact that such knowledge is indispensable to an ascertainment of the fact as to whether the patents in suit are for improvements of the same. If they are, they fall within Article 2 of the license agreement.
The several briefs of counsel abound in cited cases with respect to the established rules for the ascertainment of what is or what is not a patentable improvement. The rules are not perplexing or obscure. It is the application of the same under a given record that often involves difficulty. Sec. 210, page 296, Volume I, of Robinson on Patents, defines an improvement as follows:
An improvement is an addition to or alteration in some existing means, which increases its efficiency without destroying its identity. It includes two necessary ideas: first, the idea of a complete and practically operative art or instrument, either natural or artificial, as the original to be improved; and second, the idea of some change in such art or instrument, not affecting its essential character, but enabling it to produce its appropriate results in a more perfect or more economical manner. When such a change involves the exercise of the inventive faculties it is a true invention and is known as an improvement.
Plaintiff’s first patent in suit, #1317609, is stated by the plaintiff to constitute “an improvement upon the detonator” forming the basis of plaintiff’s previous application, serial #117579, which matured into issued patent #1317608. The latter patent is the one expressly covered by Article 4 of the license agreement. The specifications of patent #1322083, which materialized from application #98737 which is cov *425 ered. by article 1 of the license agreement, in describing the detonator use this language:
Fitted for longitudinal movement within the casing 10 is a sliding inner detonator tube 20, which, as explained, extends forwardly to near the outer end of the casing, and at its rear end terminates in and is connected conveniently by being screwed into what I have termed a detonator-carrying head or plunger 21, which is in effect a plug which closes the rear end of the tube 20, is internally cylindrically bored a certain distance to receive said end, and beyond the termination of the cylindric bore is preferably formed with a conical bore 41, the open apex of which enters a transverse bore 42, which is filled with the detonating material 43, so packed within it as completely to fill it at each end against the inner smooth walls of the casing 10.
The above form of detonator construction, devised in conjunction with what is termed “the detonator-carrying plunger 21 and sliding tube 20”, was designed to permit the functioning of the sliding or telescopic annular tube which carried the detonator into contiguity with the booster charge, where it was exploded when the extruding tube contacted its target and the bullet therefrom contacted the detonator, causing the explosion of the charge contained therein.
Repeating in part what has already been said, the primary purpose of the positioning of the detonator, as well as the method of its operation, was to assure safety, certainty of operation, and secure the explosion of the bomb at a predetermined distance above the surface of the earth or other target. The detonator was charged with fulminate of mercury, a highly explosive compound and obviously to be handled with great care. While there were seemingly no glaring imperfections in plaintiff’s detonator, he did in the specifications and claims of patent #1317608 seek to improve it.
Paragraph five of Finding 12 depicts in the following language plaintiff’s structural features of his improved detonator:
The detonator body or element which is shown in detail in figure 3 comprises a solid body carrying the detonating material in a pocket or belt 10 formed about its periphery; the detonator body is of steel and is of sufficiently heavy con *426 struction so that it will not break into fragments and is not dangerous in itself if accidentally exploded when in the safe or remote position. The spool-shaped ends of the detonator are also sufficiently heavy to confine the explosive forces in a radial direction so that the detonation may take place outwardly when the detonator is in the firing position.
From this disclosure it is apparent that plaintiff’s conception of an improved form of detonator embraced structural features intended to concentrate the force of the explosion when the detonator was exploded in the booster charge, and to add safety features in the event of its accidental firing, or when charged with fulminate of mercury. The improvement thus described did not alter in any essential particular the operativeness of the original bomb. Granting to it the widest latitude possible, the improved detonator simply facilitated the certainty of explosion of the same.
What has just been said as to patent #1311608 is as a prelude to discussing patent #1317609, plaintiff’s first patent in suit. The former patent is not involved in this case, for under the license agreement a gratuitous right was given the Government to use or manufacture it. Patent #1317608 covered an improvement to the detonator described in plaintiff’s application for and letters-patent #1322083, and following this in order comes patent #1317609.
It is difficult in a patent opinion to summarize the descriptive features in an application for letters patent. It is appai’ent, however, that it must be done because the insertion of the detailed specifications involves a repetition of the findings and extends an opinion to great length. If error inadvertently creeps into the opinion the findings will correct it.
Patent #1317609 is clearly for an improvement to not only patent #1317608 but also to patent #1322083. The subject matter of patents #1317608 and #1322083, so far as bombs and detonators are concerned, is identical. The alleged progress in the art emanates from the same inventor and the obvious intent and purpose of the step taken is to improve what has gone before.
The inventor in patent #1317609 did no more than alter to some extent the structural features of the detonator de *427 scribed in patent #1317608. It did not involve a high degree of invention to alter the structural form of an existing detonator, or the arrangement of the related elements of an existing bomb to procure an explosion of the bomb. The inherent functioning of the elements employed was old, encasements and forms were old, and while the plaintiff’s conception did in some respects add safety features to the detonator and increased its efficiency as an exploding medium, his device was in no sense a basic one. It was a unit of the combination of elements in a bomb to which the plaintiff was assiduously addressing his inventive genius.
Is patent #1317610, also for an improvement to patent #1322083, covered by the terms of Article 2 of the license agreement? We think it is. It may not be successfully controverted that patent #1322083 disclosed a structural form of a booster charge, and we think it is equally obvious that the booster charge conceived by the inventor in patent #1317610 is no more than a structural variation from the original one. The plaintiff in his specifications states—
_ “The object of my invention is to improve the construction of such devices in order that the same may be more economically and efficiently manufactured and assembled and to render the same more effective in operation.”
In the court’s opinion the mere fact that an explosive unit is adapted for use in various forms of explosive shells does not accord to it the character of a basic invention. The issue in this case is not the validity of the patent but whether under Article 2 of the license agreement it constitutes an improvement to the booster charge described and disclosed in plaintiff’s application for letters patent #1322083 mentioned in Article 1 of the agreement. A booster charge is an indispensable element in practically every form of explosive missile, and its adaptability to high explosives, with which art the plaintiff was particularly concerned, is manifest from the specifications and claims of the patent.
The plaintiff in his specifications as to patent #1317610 does not specify the invention claimed as an element in the combination disclosed and described in patent #1322083, nor does he in the claims do more than claim the construe *428 tion specified. This does not however foreclose the possibility of characterizing the same as an improvement. It is a familiar principle of patent law that while an improvement essentially implies the existence of an original on which it rests it is necessarily a complete invention in itself, a distinct unit having an “identity of its own.” Robinson on Patents, Sec. 218, page 302, Vol. I.
If the booster construction covered by patent #1317610 is inserted in the aircraft bomb described in patent #1322083 instead of the booster charge disclosed, undoubtedly it would function to add efficiency of operation to the mechanism previously employed, and the right to make and use an improved aircraft bomb over the one shown and described in the application specified, was granted the United States under Article 2 of the license agreement provided the plaintiff invented the same, and this he did.
What we have just said as to patent #1317610 applies to patent #1317611 and it will not be repeated, except to state that as to both patents the improved devices relating to mechanical improvements are not to be designated as possessing no important advancement in the art. On the contrary, the improvements noted were comparatively valuable contributions to the efficiency, safety, and designed purposes of aircraft bombs.
The facts which lead to the conclusion that all the patents up to this point discussed are for improvements to the original one, are that in each patent the alleged separate unit described and claimed was devoid of utility and operativeness except in combination with the additional elements of a bomb or other explosive missile. A detonator and a booster charge segregated from the other elements of an airplane bomb were without value to the art.
Patent #1317612 did not involve an improvement to patent #1322083 and for this reason, being excluded from the license agreement, is subject to challenge as to its validity. This invention did not add to nor subtract from any single element utilized in plaintiff’s original conceptions as evidenced by prior patents, and therefore could not be an improvement in the sense in which that term is used in patent law. It was an independent patent. The right of *429 the plaintiff to recover compensation for its manufacture by or for the United States is dependent upon the Trading with the Enemy Act, supra, a matter to be discussed later in this opinion.
Patent in suit #1317612 like the preceding ones relates to a form of bomb construction, and as the specifications state, “particularly to that type of bomb which is dropped or launched from an aeroplane and explodes on contact.” It is, as the patentee states, “of the greatest importance that such devices should be entirely water and weather proof.” We set forth in Finding 25 an illustratior of plaintiff’s patent and details of its construction. The form of construction described and claimed is undoubtedly new, novel, operative, and a distinct contribution to the art.
While the elements employed to effect the combination disclosed in patent #1317612 were old, bringing them into combination in the form disclosed produced structural features which did ¡accomplish their intended purposes. Finding 25 expresses the fact accurately as follows:
By virtue of such a combination of elements, the spring member not only possesses the function of withdrawing the pin when the release wire frees the same, but also functionally cooperates, because of its constant pressure on the pin, to tightly compress the gaskets, thus causing them to snugly fit about the pin and thus form a waterproof joint. By this form of construction, when the release wire is removed from the pin, pressure is automatically removed from the gaskets, thus causing them to loosen on the pin and at the same time the spring withdraws the pin from the detonator rendering the same free for movement in the guide tube into juxtaposition with the booster charge.
The defendant characterizes the foregoing patent as no more than an unpatentable aggregation of elements old in the art, grouped in such a way as to involve no more than mechanical skill. The record fails to support the contention. Careful 'analysis of the prior art cited and the functioning of the elements of plaintiff’s patent indisputably establish Finding 45 of the court to be accurate. We quote the final paragraph of the finding with respect to the patent cited as anticipatory.
*430 This patent does not disclose a waterproof packing gasket surrounding a movable pin and having a resilient means or spring possessing the dual cooperative function of compressing the gasket and ejecting the pin when the retaining means for the pin is removed.
The problem confronting the plaintiff was one involving the maintenance of the detonator in the rear or tail of the bomb as an element of safety, and at the same time affording operative means to move it forward when the bomb was released. In the prior form of construction, to accomplish the ¡above result apertures or openings in the outside surface of the bomb were clearly susceptible to the admittance of water and in no substantial way free from exposure to additional weather conditions.
Plaintiff’s ingenious method of employing pin 10, especially in combination with the designated “spiral spring 14”, created a combination which not only functioned to maintain the detonator in its designated position until the bomb was launched, but also accomplished a sealing of the openings occasioned in the outside surfaces of the bomb against rain or other weather conditions.
The importance of accomplishing what plaintiff did was a recognized fact. The plaintiff recognized it and so did Gallagher, whose patent is cited as anticipatory. Gallagher’s patent was essentially different from plaintiff’s. In plaintiff’s patent the spiral spring 14 and the release wire 15> combined to exert the pressure necessary to seal the openings, and when subsequently the release wire was withdrawn to launch the bomb the spiral spring 14 not only operated to eject the pin 15 but possessed the “dual cooperative function of compressing the gasket” and procuring a sealing of the openings until the bomb was launched.
Manifestly, spiral springs were old and resilient wire connections may be and had been made to function in such a way as to exert pressure, but until the advent of plaintiff’s device they had not been combined in this particular art to-produce the result accomplished. It exacts more than mechanical skill to conceive an essential element of a combination and make it serve a double puz’pose. This is precisely *431 what plaintiff did. Cumming v. Baker & Hamilton, 144 Fed. 395.
An issue of validity is also pleaded as to patent in suit #1318955. Plaintiff in the brief makes this statement:
The arming problem was not completely solved until Barlow conceived the important invention, still utilized by the defendant, of having the arming mechanism in the tail of the bomb and effecting its actuation by the pull of the bomb itself, when discharged, so exerted upon a longitudinally movable arming wire that the reaction to this pull would not disturb the equilibrium of the bomb, or cause any disturbance of its intended trajectory, or tend in any way to snag the arming wire and prevent its proper functioning.
The court’s Findings 28, 46, and 47 disclose the situation with respect to the above-mentioned patent. Plaintiff utilized elements of long-known functioning capacity to operate the mechanism disclosed in patent #1317612 and at the same time maintain practically undisturbed the horizontal position of the bomb located underneath the airplane, thereby tending to maintain its proper trajectory towards its objective.
No disputatious record exists in reference to the necessity of launching an airplane bomb in such a manner as to cause its contact with the contemplated target. An airplane moves rapidly, and to accomplish precision in launching a bomb exacts its release in advance of attaining a position directly above the target.
Plaintiff’s invention as defined by the claims of this patent did no more than add to the pin release mechanism of his former patent #1317612 a cleat member located approximately at the center of gravity of the bomb around which the flexible release wire passed, so that when the bomb was released the fact that the upward extension of the wire operating through the cleat or pulley served to project the bomb downwardly in its then horizontal position in order not to deflect it from its proper trajectory, did not, we think, involve or exact the inventive faculty.
To so combine elements old in the art in a way that produces results long known to follow such a combination of the same is not invention but is the exercise of mechanical *432 skill. Innumerable examples might readily be cited exemplifying common knowledge of the fact that the pressure exerted by a falling body may be centered thereon by the use of cleats or pulleys in order to direct as far as possible its trajectory by the use of ropes or wires either operated manually or by the force of its own weight through the medium-ship of directed application of the operating means. We think Finding 47 is amply sustained by the record and the prior art.
The last patent in suit is #1318956. Novelty is claimed for two features of airplane bomb construction. The court’s Finding 31, in which an illustration appears, sets forth the facts. Taking them up in the order discussed in the briefs, we find the first to be a structural feature intended to provide an air check in the “sliding tube through which the detonator moves from a safe position at the rear of the bomb to a firing position adjacent the booster charge.”
The above feature emanated from the necessity of preventing the explosion of the bomb until it had descended a comparatively safe distance from the plane. An airplane in close proximity to the earth may under certain conditions be forced to make a landing, or may be over friendly territory and the normal employment of the bomb be dispensed with, or it may be essential to lighten the weight of the plane to launch the bomb when close to the earth without causing its explosion. All these, and perhaps additional incidents accompanying the flight of bombing planes, suggested to plaintiff his conception contained in the specifications and claims of patent #1318956.
To accomplish a retardation of the arming of the bomb until it had reached an approximate distance from the airplane upon launching, the plaintiff provided a structure which obtained an air check. The patent exhibits that this air check is obtained by constricting that portion of the tubular guiding member shown in the illustration at 22 in Finding 31, thereby delaying the detonator’s descent through the tube to the booster charge to a gradual one so that if the bomb' came into contact with any object when dropped a comparatively short distance from the ground *433 the air check thus created would prevent contact between the firing pin 32 and the fuse cap 34, precluding explosion of the bomb. Claims 1, 2, 3 and 4 of the patent are in issue.
The defendant assails this patent from at least two angles, contending against its validity upon prior art and that what was done involved only mechanical skill and not invention. Findings 48, 49 and 50 disclose the extent and teachings of the prior art patents relied upon to invalidate the claims mentioned. It is clear from the patents cited that the inventors’ objective in the prior art was to facilitate the explosion of the missiles and not retard it. Plaintiff sought to effectuate a contrary result, i. e., to check the explosion of the bomb and prevent its explosion if perchance the airplane was in comparatively close proximity to the earth. It is impossible from an analysis of the specifications and claims of the prior art patents cited to reach a conclusion that any one of the patentees conceived a device in the nature of an air cheek or the idea of utilizing air through mechanical means to so operate. Their efforts were directed towards the elimination of air chambers, not their utilization.
Defendant cites with apparent confidence a long list of decided cases which clearly establish the quotation in its brief, taken from the case of Blake v. San Francisco, 113 U. S. 679, 682. It is as follows:
It follows from this principle that, where the public has acquired in any way the right to use a machine or device for a particular purpose, it has the right to use it for all the like purposes to which it can be applied, and no one can take out a patent to cover the application of the device to a similar purpose.
The Blake case involved an automatic valve adapted for use on steam fire engines. The improvement upon valves claimed was stated to result in relieving the pressure upon fire hose by regulating the discharge of water through the same, and prevent them from bursting. The court found that automatic valves had long been in use, adapted and applied to other types of steam engines to accomplish the *434 identical result. In the exact words of the court it was said:
For instance, an automatic relief valve, used to relieve the pressure of steam, produces no new result in character when used to relieve the pressure of water, unless some further effect besides the mere relief of pressure is obtained. This qualification, therefore, will not affect the present case, because no new result in character is accomplished by the supposed invention of the plaintiff. Besides, it appears from the evidence that before Bailey’s patent was applied for, relief valves were in common use, both on land and at sea. They were "commonly used on the steam feed-pipnps of steamships. These pumps were usually fitted with nozzles for the attachment of hose, so that the feed-pump could, in case of need, be used as a steam fire engine.
What was said by the Supreme Court in the case of Pennsylvania Railroad v. Locomotive Truck Company, 110 U. S. 490, 494, embraces the rule followed consistently by the Federal courts since. It is as follows:
It is settled by many decisions of this court, which it is unnecessary to quote from or refer to in detail, that the application of an old process or machine to a similar or analogous subject, with no change in the manner of application, and no result substantially distinct in its nature, will not sustain a patent, even if the new form of result has not before been contemplated.
If inventors in a series of granted patents found as an obstacle to their operativeness the presence of air chambers, and designed devices intended to remove this impediment, may it be said that an inventor who utilizes through mechanical means this precise element to obtain operativeness by both a change in manner of operation and the production of a substantially distinct result, has applied an old process to a similar or analogous subject? We think not. The teachings of the prior art patents fall far short of suggesting to those skilled in the art that by a mere rearrangement of elements the result accomplished by the plaintiff could have been done readily. The invention here in issue having resulted from the plaintiff’s proceeding in a direction directly contrary to the teachings of prior art, is indicative, we think, of accomplishing more than those skilled in the *435 art would do, and therefore possesses the elements of inventive genius.
The second feature of this patent presents ingenious structural elements described in detail in Findings 31, 48, 49, 50, 51, 52, and 53. The first approach to an analysis of this feature might easily lead to- a conclusion that it did not involve invention to do what plaintiff did. More deliberate consideration, however, confirms a conclusion that the specifications and claims disclose new and novel features, operative and useful. Claims 7 to 9 and 10 to 13 are involved.
Plaintiff conceived the idea of bringing about the possibility of handling and transporting the detonator “separately from the main bomb load” and thereby allow the bomb to be assembled at the point chosen for such a service. To accomplish the separation of the forward casing member, which contained the booster charge from the rearward casing member containing the detonator, plaintiff suspended the booster charge in the manner illustrated in Figs. 1 and 4 of the specifications.
The ring extension 28 disclosed in the illustration was so “shaped to provide a rearwardly extending seat of reduced diameter for receiving the casing member 5.” In other -words, by securing the ring mentioned to ‘both the inner surfaces of the rear casing, the structure detailed operated to not only maintain the booster charge in suspension but also insured the alignment of the detonator tube therewith so that when the rear and forward casing were joined as detailed the operativeness of the bomb was assured.
It is manifest that the stabilizing vanes attached to the rearward member of the bomb were old, and their stabilizing function well known. A contention to the contrary is not advanced by the plaintiff, but to utilize them as elements of the combination which enabled the division of the two casing members of the bomb, and thus facilitate its safe and convenient handling, was an original conception of the necessity of suitable connecting means to insure the proper reassembly of the bomb when ready for use. As we understand the patent, its utility was centered upon a provided *436 means which enabled- if need be the removal of the booster charge and detonator from their encasements when the forward and rearward members of the bomb were separated, and their replacement later when the parts were re-assembled, thus providing features of safety and convenience in the matter of indispensable incidents in the manufacture and handling of bombs.
There are many cases in the books involving discussions and establishing precedents as to the distinction between mechanical skill and invention. To cite them would be useless. Invention is universally conceded to involve the creative faculty. Mechanical skill as such may be said in many respects to be the opposite. The art with which we are at present dealing concerns high explosives and their employment as instrumentalities of destruction. To- so employ them comprehends not only the contemplated scope of their effectiveness when utilized, but the extreme hazards inseparably connected with the process of arming, transporting, and launching them from an airplane.
An inventor whose inventions disclose a scientific knowledge of the details of bomb construction and by a combination of elements accomplishes advanced and important steps in the development of the art which find favorable acceptance and use, exercises more than the fixed standards of workmanship, and is entitled to the benefits of the patent laws.
The right of plaintiff to receive compensation under patents #1311612 and #1318956 is dependent upon the provisions of the act of October 6, 1917 (40 Stat. 394), as follows:
That whenever during a time when the United States is at war the publication of an invention by the granting of a patent might, in the opinion of the Commissioner of Patents, be detrimental to the public safety or defense or might assist the enemy or endanger the successful prosecution of the war he may order that the invention be kept secret and withhold the grant of a patent until the termination of the war: Provided, That the invention disclosed in the application for said patent may be held abandoned upon it being established before or by the commissioner that in violation of said order said invention has been published or that an application for a patent therefor has been filed in a foreign country by the *437 inventor or Ms assigns or legal representatives, without the consent or approval of the Commissioner of Patents, or under a license of the Secretary of Commerce as provided by law.
When an applicant whose patent is withheld as herein provided and who faithfully obeys the order of the Commissioner of Patents above referred to shall tender his invention to the Government of the United States for its use, he shall, if and when he ultimately received a patent, have the right to sue for compensation in the Court of Claims, such right to compensation to begin from the date of the use of the invention by the Government.
The application for patent #1317612 was filed February 27, 1918. Secrecy notice was mailed to plaintiff April 22, 1918, and letters patent issued September 30, 1919. Patent #1318956 contains this notation, “Continuation in part of application Serial No. 195,609, filed October 9, 1917. This application filed May 27, 1918.” Secrecy notice was mailed to plaintiff July 10, 1918. The defendant, relying upon the findings of fact, contests plaintiff’s right to compensation under the foregoing act, contending that the plaintiff’s predecessor in title did not tender the use of the inventions to - the United States as the act requires.
The issuance of secrecy orders by the Commissioner of Patents is established, and if a formal tender involving the supplying of patent applications and specifications of the patents, as well as direct contact with authorized contracting officials, is exacted, the contention advanced challenges careful consideration.
In the case of Zeidler v. United States, 61 C. Cls. 537, this court for the first time construed the act of October 6, 1917, and in so doing said:
The act of October 6, 1917, expressly required a “tender” and a subsequent “use” by the Government before the right to sue for compensation attached. > Manifestly, when a patented device is tendered for use and is thereafter used, without claim, of right upon the part of the Government to use, a corresponding liability to pay for such use arises. This has been the established rule of law for a long period of time and was the state of the law when the act of October 6,1917, came into being. Société, etc. v. United States, 224 U. S. 309. The act of October 6, 1917, a war measure, *438 was obviously not intended to bold the Government responsible for the use of a patented device in the absence of an express or implied contract to pay for such use. Its terms expressly so state. What it did do was to extend a wholesome and just protection to prospective inventors by saving to them a right to sue for compensation for the use of their patents when letters patent were finally issued, and recover compensation from the date of user instead of from the date of letters patent. The war necessitated secrecy. The Commissioner of Patents was given discretion to enforce secrecy, and he could only discover from the application for patent when the necessity for the exercise of his discretion was essential. Having made the discovery and exercised his discretion, the issuance of the letters patent was positively suspended. The established process of procedure being thus arrested and the inventor’s rights suspended, the inventor might still tender his patent to the Government for use — i. e., disclose his application to the full extent — and with matters in this inchoate condition not lose his right to sue and recover compensation for its use, if it was used, to the same extent as if he had letters patent at the time of user. In other words, the law saved to the inventor all rights and privileges which might have resulted disastrously to any claim for compensation by reason of its passage without this saving clause. It is difficult for us to conceive that more was intended (pp. 552, 553).
The usual course of dealing in cases of this sort is for the inventor to tender his patent directly to the Government through the appropriate department and solicit its substitution or use by the Government by specifying such a use in Government contracts (p. 556).
In the Ordnance Engineering case, 68 C. Cls. 301, plaintiff contended that it was entitled to compensation for use of the patents involved, under the act of October 6, 1917, the defendant insisting to the contrary. In deciding this issue the court said (pages 357-358) :
The requirement of a tender of an invention was, we think, regarded by Congress as an essential condition precedent to the right of recovery under the statute, because it afforded advance notice to the Government and the option to use or not use. The statute clearly contemplates a real tender — i. e., the bringing to the attention of the Government the essential facts with reference to the invention so that subsequent use of the invention may prevail with knowledge of liability for the same. We can not read this provision out of the statute.
*439 In the Allgrunn case, 67 C. Cls. 1, the tender of the invention under the act of October 6, 1917, was clearly established. In the instant case it is to be noted that each of the patents sued upon was not granted until 1919. Patent #1317612 was not applied for until February 27, 1918, and the application for patent #1318956 was not finally completed and filed until May 27, 1918. Hence, as to these two patents, with which this issue is concerned, the plaintiff could not have made a so-called tender until some date subsequent to the filing of the applications.
We say this because it is evident that much of the evidence directed to establish tender fails to do more than seek to establish tender for use dependent upon applications which in most instances antedate the applications for the two patents under which we hold the plaintiff to be entitled to compensation under the foregoing statute. Obviously, the reason for the plaintiff’s relying upon all the evidence as to tender is attributable to the fact that plaintiff alleges in the petition that recovery is allowable for the use of all six of his patents, under the act of October 6, 1917.
The word “tender” used in the act of October 6, 1917, is not to be given any other meaning than its ordinary one. The statute is a remedial one, and the intent of Congress in exacting a tender of an invention for use was to put the Government upon notice that by user liability to pay the applicant therefor might arise. Its meaning is synonymous with “offer” and there is nothing in the act as a whole which in any way indicates that more was exacted of an applicant than bringing to the attention of the officials the i fact of a pending application for a patent and that the ! Government might use it in any way it might choose. The.] contention that formal proceedings are involved in making a tender is untenable. Subsequent to the date of tender the Government, as well as the applicant, was free to examine the application tendered and ascertain the nature of the invention.
On September 22, 1918 (Finding 58), the plaintiff expressly notified the defendant that bombs were being made in this country under his patent, and sought not only advice as to the manner of waiving any claims against the Gov *440 ernment for their manufacture and use but expressly waived any claim which might accrue under the circumstances. The Assistant Secretary of War declined to accept the waiver of plaintiff’s rights. The plaintiff on other occasions was willing to waive any claims against the Government.
We think the letter of September 22, 1918, constitutes a tender within the intent and meaning of the act of October 6, 1917. It brings home to the acting head of the War Department all the facts with respect to existing bomb manufacture and use; points out the infringement of plaintiff’s patent, and offers the Government the express right to manufacture and use as it may see fit all bombs previously or thereafter manufactured which fall within plaintiff’s pending applications for patents. What is more, the letter is addressed to an official with authority to make contracts.
The defendant predicates a defense to plaintiff’s suit upon a contention that the facts as stated in Findings 56 and 57 clearly constitute an implied license to use the patents in suit. To support its argument a copious quotation from the opinion of the Supreme Court in the case of De Forest Radio Telephone and Telegraph Co. v. United States, 273 U. S. 236, is set forth in the brief. The quotation is inapposite to the issues in this case. The De Forest ease was commenced in this court and the recovery sought was for compensation for the use of the patent under the act of June 25, 1910, as amended by the act of July 1, 1918. We have held that as to four of plaintiff’s patents in suit the defendant had an express license to use and manufacture, and that as to the two remaining patents plaintiff was entitled to compensation under the act of October 6, 1917, and obviously the quotation cited has no application to litigation coming within the latter act.
We are likewise unable to see how Section 4900 of the Devised Statutes (U. S. C., Title 35, Sec. 49) has any application to this case. The section has to do with marking patented articles. If we are correct as to the existence of an express license it is clearly inapplicable, for under an express contract providing for manufacture and use the issue of the validity of the patent or patents mentioned in *441 the contract is eliminated. Semple v. United States, 59 C. Cls. 664; National Clay Products Co. v. Heath Unit Tile Co., 40 Fed. (2d) 617; Dall Motor Co. v. Packard Motor Co., 178 N. E. 835.
The plaintiff, as we have before observed, did not obtain a single granted letters patent until the year 1919, and during the period intervening between the filing of applications and issue of letters patent was under the imperative necessity of maintaining strict secrecy and prohibited from communicating to anyone save the United States as to his applications or their contents. In any event, under Section 4900 of the Bevised Statutes plaintiff was under no obligation to mark the patented article until letters patent were granted for the same. It may be — at least it is not proved to the contrary — that neither the plaintiff nor his predecessor in title knew of the manufacture of bombs infringing his patents by independent contractors for the United States. In addition to this, however, it is clear from the record in this case that the defendant was in possession of full knowledge of plaintiff’s patent rights, and being in such a position it could not infringe them with impunity under Section 4900.
Findings 14 and 15 disclose plaintiff’s acquisition of title to the patents involved. The stockholders of the Marlin-Bockwell Corporation are not contesting plaintiff’s rights under the supplemental agreement executed by that corporation on January 3, 1931. The special jurisdictional act authorizes the suit and waives the interposition of the defenses otherwise available under patent laws.
The case is referred to Commissioner Gordon to take proof as to the amount of compensation, if any, to be awarded the plaintiff, the amount to be determined in accordance with this opinion. Upon the coming in of the Commissioner’s report and the termination of proceedings incident thereto, the findings of fact and this opinion will be certified to Congress in accord with the provisions of the special jurisdictional act. It is so ordered.
Whaley, Judge; Williams, Judge; LittletoN, Judge; and GREEN, Judge, concur.