Lester P. Barlow v. Commissioner.
Barlow v. Commissioner
Docket No. 111717.
United States Tax Court
1943 Tax Ct. Memo LEXIS 300; 2 T.C.M. (CCH) 133; T.C.M. (RIA) 43237; May 19, 1943
*300 Joseph R. McCuen, Esq., for the petitioner. L. W. Creason, Esq., for the respondent. STERNHAGEN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $86,718.15 in petitioner's income tax for 1940. The Commissioner (1) refused to apply the 50 per cent capital gain provision of Section 117, Internal Revenue Code, to an amount received by petitioner from the United States in payment of a claim for use of a patent and treated the amount received as 100 per cent taxable as ordinary income, and (2) disallowed deductions for attorneys' fees. Findings of Fact Taxpayer resides at Stamford, Connecticut. His income tax return for 1940 was filed on the cash receipts and disbursements basis, in the District of Connecticut. He is an inventor and has been engaged since 1910 exclusively in the business of inventing, developing and exploiting inventions for profit. In February, 1914, he went to Mexico and there he joined the forces of Francisco Villa as an engineer officer with duties relating to ordnance, radio and aircraft. About July or August, 1914, at Torreon, he invented and constructed an aircraft drop bomb. About 200 of them were built before December 25, *301 1914, and about 1,400 before July 20, 1915. Some were dropped from planes before Christmas, 1914, and in 1915 during the Mexican Revolution, and they worked effectively. A drawing of the nose of the bomb, showing its firing mechanism, was made at Aguas Calientes, Mexico, in the early part of 1915. The main objective of the invention was a bomb to be dropped from an airplane and explode before penetrating the ground. This was accomplished by placing in the nose of the bomb a cartridge which, upon impact, impelled a bullet upward into the bomb at a speed about six times as fast as that of the falling bomb and exploded the charge. In July, 1915, Barlow returned to the United States and, until January 1, 1916, continued to design, build and test aircraft bombs, including the one designed in Mexico. He designed a bomb weighing 100 pounds that fired at 4 1/2 feet above land or water. In January, 1916, he took the bomb design to the War Department and agreed to work on the bombs at the Frankfort Arsenal. There he worked from February until August or September, 1916, at his own expense and not on the government payroll. The arsenal furnished facilities and materials for his experiments. *302 During that time the first full field test was made of this type of a drop bomb with improvements. The bomb was then experimental to prove the theory but not designed for production. Building for production was started in January, 1917, and, at the War Department's suggestion, some of these bombs were taken by Barlow to England in March, 1917, and subjected to military tests there. Congress made no appropriation for aircraft bomb experiments or manufacture and the War Department had no funds to purchase the invention. They suggested that Barlow try to interest private manufacturers. The Marlin Arms Corporation, subsequently called the Marlin-Rockwell Corporation, and hereafter called Marlin, became interested, and, at the War Department's request, Barlow negotiated a contract with it. Meanwhile, May 20, 1916, Barlow filed Patent Application No. 98,737 for Letters Patent on his bomb design. This was his first application for a patent on an aircraft bomb. Upon this application Patent No. 1,322,083 was issued November 18, 1919. Subsequently, on his applications, patents were issued as follows: Application
Date Filed
Number
Date Issued
Patent Number
Aug. 30, 1916
117,579
Sept. 30, 1919
1,317,608
Feb. 24, 1917
150,712
Sept. 30, 1919
1,317,609
Oct. 6, 1917
195,187
Sept. 30, 1919
1,317,610
Feb. 25, 1918
218,928
Sept. 30, 1919
1,317,611
Feb. 27, 1918
219,381
Sept. 30, 1919
1,317,612
May 27, 1918
236,915
Oct. 14, 1919
1,318,955
May 27, 1918
236,916
Oct. 14, 1919
1,318,956
*303 All these applications were held in secrecy during the European War, first under an agreement with the War Department, and then under the Trading With the Enemy Act of October 6, 1917. Grant of the Patents was withheld "until the termination of the war." Barlow's contract with Marlin was dated January 16, 1917. It recited that Applications Nos. 98,737 and 117,579, "have been allowed" and the rights thereto "stand solely and exclusively in Barlow's name and are subject to absolute assignment." Barlow agreed to assign to Marlin "all his right, title and interest" in the above applications, as well as in Nos. 104,209, 92,093, 117,578 and 120,604, and in "any and all Letters Patent which may issue thereon," and "in and to the inventions described and claimed thereby * * *." Marlin agreed to pay Barlow immediately $50,000 and to proceed with manufacture and sale of the devices, dividing the net profits 49 per cent to Barlow, 51 per cent to Marlin. It was agreed that the $50,000 was not an advance payment of profits. In the event his share of the profits were less than $50,000 in any other year, Barlow could cancel the contract in its entirety, provided he repaid the $50,000, and repaid *304 Marlin's net expenses (after deducting profits) in manufacturing and selling the devices. Marlin would then "reassign to Barlow all of the patents or applications for patents received by it and shall deliver to him all title papers, tools, drawings, models and other property capable of manual delivery connected with the development and manufacture of the inventions and devices hereinbefore specified." Barlow agreed to enter Marlin's employment at $100 a week salary, and to give his time exclusively to assisting in the manufacture and development of the devices, terminable by Marlin on thirty days' notice. After "full and complete development of the system of manufacturing the said inventions or devices, and after February 1st, 1918," Barlow could terminate the employment on thirty days' notice. Marlin agreed to prosecute in its own name or otherwise all infringement suits or other proceedings for protection of its rights under any patents or patent application involved, and to defend any actions attacking the validity thereof, the expenses of such actions to be charged to cost of production before calculation of profits. Marlin could take out patents on the devices in any foreign *305 countries and Barlow agreed to assist. The agreement referred to Barlow's pending negotiations for a contract with the United States for use of some or all of these devices at a 15 per cent royalty without initial payment, or at a 10 per cent royalty plus $5,000 initial payment: and it was agreed that the $5,000, if paid, should go to Barlow and the royalties to Marlin to be distributed between them as profits under this contract. Barlow agreed that he would assist Marlin to obtain patents on "any additional inventions relating to aerial munitions, or * * * any improvements upon the devices described in the aforesaid applications for patents * * *," Marlin to have the exclusive right thereto and they would be "governed and controlled by the terms of this agreement as fully as they they were among the inventions transferred at the time of the execution hereof." The life of the agreement was for 17 years, "and thereafter Marlin shall have the right fully and freely to use all of the said devices and mechanical appliances, or any of them, forever, without any further payment or accounting to Barlow." In January, 1917, the patent applications referred to in this agreement were assigned *306 to Marlin by Barlow. Patent Application No. 98,737, upon which later issued Patent No. 1,322,083, was the main application covering the details of the bomb which Marlin was interested in developing and as to which Barlow had been engotiating with the Government. It covered the bomb built at Frankfort Arsenal and was the basis of Marlin's agreement with Barlow and its subsequent contract with the Government. The cash consideration of $50,000 was paid to Barlow by Marlin, and a salary of about $5,000 a year. By an agreement dated April 3, 1917, Marlin licensed the United States Army to manufacture and to use drop bombs under the patent and improvements. Within six days after war was declared in April, 1917, the United States gave Marlin an order for a large number of the bombs which mounted up into millions of dollars. Feeling the contract royalty was too high in view of the unanticipated volume, Barlow agreed to a reduction, leaving the amount to be determined between Marlin and the War Department. A second contract, dated January 29, 1918, was then executed. After reciting that Barlow had theretofore assigned to Marlin certain inventions and applications for patents, Nos. 98,737, *307 117,579, 104,209, 92,093, 117,578, 120,604, 150,712, 178,603, 195,187 and 195,609, and that he was desirous of changing the basis of his agreement from a division of profits to a division of royalty, its provisions were, in part, as follows: 1. The aforesaid agreement of January 16th, 1917 and addition of January 19, 1917, * * * as well as all other agreements and understandings, whether verbal or written, between Marlin and Barlow, are hereby cancelled and made null and void. 2. The patents and applications for patents heretofore assigned by Barlow to Marlin shall belong to and remain the property of Marlin under and subject to the terms and conditions hereinafter expressed. * * * * *
5. Marlin shall proceed with the manufacture and sale of the said devices, or any of them as it shall deem wise. Marlin agrees to pay to Barlow forty-nine per cent (49%) of all royalties as and when the same shall be received by Marlin for the manufacture by it or by others of aerial munitions under the aforesaid patents, applications for patents and improvements thereon assigned to it by Barlow, and under any foreign patents or applications for patents covering the same inventions or devices *308 as may be filed by Marlin or filed by Barlow and assigned to Marlin. Such payments shall constitute the entire consideration from Marlin to Barlow for the continued ownership of such patents, applications for patents, and improvements thereon. * * * * *
The parties hereto agree that the royalty on the 13,000 so-called Barlow Heavy Drop Bombs, now in the course of manufacture for the U.S. Government, shall be fixed, for the purpose of this agreement, at ten dollars ($10.00) per bomb to be divided fifty-one per cent (51%) to Marlin and forty-nine per cent (49%) to Barlow, Barlow's forty-nine per cent (49%) to be paid when or as Marlin receives the purchase price for said bombs or installments thereof. Such Barlow Heavy Drop Bomb is a Drop Bomb adapted to explode before contact of the main body of the bomb with the earth or other target and is made in accordance with some or all of the inventions described and claimed in Barlow's application for U.S. Patent, Serial No. 98737, filed May 20, 1916, together with improvements thereon described and claimed in Barlow's applications for U.S. Patents, Serial No. 117579 filed August 30, 1916, for "Bombs or Torpedoes", and Serial No. 150712, *309 for "Detonators", filed February 24, 1917. In the event Marlin's annual payments to Barlow, exclusive of salary of $1,000 a month, should be less than $50,000, Barlow had the right to cancel the contract in its entirety and Marlin would then reassign to Barlow all the patents, patent applications and improvements thereon. Marlin agreed to bring all necessary suits for infringement of the patents or patent applications in its own name or otherwise, and Barlow might bring such suits in Marlin's name if necessary. The duration of the agreement was to be 16 years, after which Marlin should have the right to use all the devices in question without further payment to Barlow, provided the agreement had not been sooner cancelled in accordance with its terms. The annual payments due Barlow for 1917 and 1918 under the agreement of January 16, 1917, as modified by the agreement of January 29, 1918, were paid by Marlin, also about $8,000 salary in 1918. No payments were made for 1919, 1920, 1921, 1922, or 1923. In 1923, when about $200,000 was due, Marlin was in receivership and Barlow asked the receiver either to make the payments or to release the patents according to the contract. A settlement *310 agreement dated August 3, 1923, was executed, by which Barlow waived and released all claims against Marlin and it assigned to him all its claims against the United States, or any corporation, individual, or partnership, for the infringement or use of the inventions covered by the agreements of January 16, 1917, January 19, 1917, and January 29, 1918. All of the patents were assigned to Barlow under date of August 9, 1923. A further confirmation of assignment was executed January 3, 1931. The Marlin claim against the United States was assigned to Barlow and had no readily realizable market value at the time of the 1923 assignment. The War Department declined to enter into negotiations for settlement on the ground that a claim against the Government cannot be legally assigned, and a private Act of Congress (Private Act, 44 Stat., pt. 3, p. 1844) was passed and signed by the President March 3, 1927, as follows: That the Court of Claims is hereby authorized and empowered to hear and determine the claim of Lester P. Barlow against the United States, arising out of the use by the United States of certain inventions of said Lester P. Barlow described by United States Letters Patent Numbered *311 1317609, 1317610, 1317611, 1317612, 1318955, 1318956: Provided, That within one year from the date of the approval of this Act said Lester P. Barlow shall file in said Court of Claims his petition setting forth the statement of his said claim; and provided further, That section 3477 of the Revised Statutes of the United States, and any statutes of limitation ordinarily applicable, be, and the same are hereby, waived and shall not be considered or applied by the Court of Claims in considering and adjudicating the above-described claim of Lester P. Barlow; and such finding on the law and facts of said claim as the Court of Claims may make shall be reported to Congress: And provided further, That in any such suit the United States may avail itself of any and all defenses, general or special, except as otherwise herein waived: Provided, further, That the Court shall further find and report the law and the facts touching any claim by way of offset that the United States may have against the Marlin Rockwell Corporation the right to plead which against any claim the said Lester P. Barlow may assert is hereby recognized. Under authority of this Act, proceedings were instituted in the United *312 States Court of Claims and after eleven years of litigation the court made findings of fact and law (82 C. Cls. 360, February 3, 1936; 87 C. Cls. 287, June 7, 1937). It found that "each of the patents in suit was issued to Marlin-Rockwell Corporation, having been assigned by plaintiff to said corporation." The court found that there was due Barlow from the United States a 10 per cent royalty amounting to $494,856.01 for the use of patents 1,317,609, 1,317,610, and 1,317,611, under a license agreement dated April 3, 1917, between the United States and Marlin Arms Corporation; that such patents covered improvements on patent 1,322,083; that $97,663.20 with interest at 5 per cent from February 10, 1919, was due under the Trading With the Enemy Act - October 6, 1917 - for infringement of patents 1,317,612 and 1,318,956 (not directly related to patent 1,322,083), making a total without interest of $592,719.21. After the Court of Claims made its findings and report to Congress, Barlow employed Francis Michel, an attorney, to represent him before Congress and obtain passage of an appropriation bill. Private Act No. 555 was passed and *313 signed September 6, 1940, as follows: That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Lester P. Barlow the sum of $592,719.21, in full settlement of his aerial torpedo patent-infringement claim against the United States as found by the Court of Claims to be due him in its decision of June 7, 1937: Provided, That no part of the amount appropriated in this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.00. Payment of the $592,719.21 was made in two equal installments of $296,359.60 each in 1940 and 1941. The interest found to be due by the Court of Claims, amounting to approximately $100,000, was not included in the Act. There are two types of claims bills passed by Congress, one confers jurisdiction on the Court of Claims *314 or the District Court, the other makes a direct appropriation to the claimant. It is the practice to include in direct appropriation bills a provision limiting the amounts of payments to agents or attorneys to 10 per cent of the amount of the appropriation; such a provision is not included in acts conferring jurisdiction on a court. Barlow, from before 1914 through 1940, was engaged in business as a mechanical engineer and inventor of mechanical devices, during which period he held a number of inventions and patents and made inventions and patents in the following fields: Glass, pumps, steam and gas engines, high pressure steam boilers, areonautical equipment, explosives, bombs and other military devices, guns, pneumatic tubes, cooling systems for internal combustion engines, refrigeration systems, methods and tools for mass production, and counterfeit deterrent devices. It was his practice to hold his patents and inventions and to license others to use them. The only ones sold were the group to Marlin, following the suggestion of the War Department, and one to the McCord Radiator Manufacturing Company, of Detroit, that had been a license for four years but because of business difficulties *315 could not perform the licensing agreement. A patent for phonograph records was assigned without compensation to the attorney who handled the Patent Office application. In 1917 and 1918, under his Marlin contracts, Barlow received less than $100,000, of which less than $50,000 came to him personally and the balance was paid to others having an interest in or claims on his inventions. During those years he received approximately $17,000 in salary from Marlin. In his 1940 return Barlow disclosed the receipt of $296,359.60 under the appropriation act, but included only 50 per cent thereof, or $148,179.80, in taxable income on the ground that under the provisions of the Internal Revenue Code pertaining to capital gains and losses only 50 per cent was taxable. The Commissioner included the full amount of $296,359.60 in taxable income for 1940. In 1940 Barlow paid fees to attorneys for services performed in the proceedings before the Court of Claims from 1927 to 1938, inclusive, as follows: Charles L. Frailey
$ 1,500.00
Paul Hayworth
11,500.00
H. Dorsey Spencer
25,000.00
Hiram C. Todd
25,000.00
$63,000.00
None of these attorneys took any part in presenting the claim to *316 Congress, but two of them testified before the Committee on Claims of the House as to proceedings in the Court of Claims. None of them was paid for services before Congress in connection with passage of the special appropriation act. In 1940, after the decisions by the Court of Claims, Barlow paid a fee of $7,500 to Francis Michel for services rendered in aiding and representing him before Congress in obtaining passage of the private direct appropriation bill. In 1940 Barlow paid a fee of $10,000 to the firm of Tilson, Stanley & McCuen for representing him in the United States District Court for the District of Columbia, the United States Court of Appeals for the District of Columbia, and the Supreme Court of the United States, in a suit filed against him by John F. Clark, who claimed a one-half interest in the sum appropriated to Barlow by Congress. Clark v. Barlow, 122 Fed. (2d) 337. Part of this fee was for services in adjusting Barlow's fee accounts with other attorneys. The firm rendered no services in connection with the passage of the appropriation act. The Commissioner disallowed the deduction of $7,500 paid to attorney Francis Michel on *317 the ground it was lobbying expense, reduced the remaining deduction for attorneys' fees to $29,635.96, or 10 per cent of the amount of the appropriation received in 1940, and disallowed the excess of $43,364.04 on the ground that payment of an amount prohibited by statute is not an ordinary and necessary expense. Opinion STERNHAGEN, Judge: I. When the petitioner in 1940 received from the United States $296,359.60 as the payment of half the award resulting from the determination by the Court of Claims (Lester P. Barlow v. United States, 82 Cls. 360; 87 C. Cls. 287), he included $148,179.80, or 50 per cent, in the income shown on his tax return for that year, upon the ground that the amount received was "gain upon the sale or exchange of a capital asset held for more than twenty-four months, within the meaning of Section 117 (b), Internal Revenue Code". The Commissioner determined that Section 117 was not applicable "for the reason that said amount was not received upon a sale or exchange of capital assets held for a period of eighteen months or more" and insists that the amount is ordinary income covered by the general definition in Section 22 (a). *318 Barlow was the original inventor of the drop bomb and, as shown by the findings, the practical usefulness of the invention had been proven in 1914, so the invention had been reduced to practice before January, 1915. Application for a patent was filed May 20, 1916, and by a contract with Marlin of January 16, 1917, Barlow's rights under the invention and improvements were sold to Marlin in consideration of a down payment of $50,000 and a 49 per cent share of net profits from the invention. That Barlow sold his patent rights to Marlin by this January 1917 contract was recognized by the Patent Office, the Court of Claims [1] and the United States Court of Appeals, D.C., [2] and there is no room for question about it. Because of the large requirements of the United States after its entry into the European War the profits were voluntary reduced. In January, 1918, the contract with Marlin was cancelled and then cast in a new form to provide for a division of royalties instead of profits but recognizing without change the transfer to Marlin of title to the patents and inventions. Payments under these agreements were made by Marlin to Barlow in 1917 and 1918, but none were made thereafter. *319 Marlin then went into receivership, and on August 9, 1923, in settlement of the rights under the 1917 and 1918 contracts, an assignment was made by Marlin to Barlow of the invention and patent rights which had been acquired by Marlin in the earlier contract and of Marlin's claims against the United States for infringement or for use of the invention. Thus Barlow became, in 1923, the owner of the inventions and patents which had up to that time been completely owned by Marlin, and this was entirely by virtue of the 1923 contract and not because Barlow had been the original inventor or applicant for a patent. Cf. Hyatt Roller Bearing Co. v. United States, 43 Fed. (2d) 1008. The original patent and the several successive patents on improvements had been issued to Marlin. Marlin was the original patentee and not an assignee of the patent. In January, 1917, Barlow had sold his rights in the invention to Marlin for a consideration of $50,000 cash and a promise *320 of 49 per cent of the profits or royalties. Since the petitioner does not assert any cost basis for the invention and patent rights thus sold, the entire amount received at whatsoever time was gain from the sale. Commissioner v. Hopkinson, 126 Fed. (2d) 406. The fact that the amount of such proceeds was not received at the time of sale and that the receipt was postponed does not change or affect the truth that the proceeds, whenever received, were all gain upon the sale in 1917. If the definition of capital gain had been in effect in earlier years, any amount received by Barlow after he had made the contract with Marlin in 1917 would have been capital gain. The failure of the United States after the 1923 assignment to pay Barlow for use during the European War upon the theory that, since Barlow was an assignee, the claim was invalid. There was complete recognition that Barlow's interest and ownership in the patents was derived from the contract of 1923. This was the reason for the War Department's refusal to recognize his right as a claimant. Congress then authorized a determination of the claim by the Court of Claims. The Court of Claims made the *321 categorical finding that "On August 9, 1923, an assignment was made transferring from Marlin-Rockwell Corporation to the plaintiff 'all its right, title, and interest in and to each of the following letters patent of the United States and the inventions covered hereby'." We see no escape, therefore, from the view that when petitioner in 1940 received the payment from the United States of the award upon the claim for use of the invention, he was realizing the gain upon the 1917 sale of the invention to Marlin. He was therefore entitled to have the gain taxed as a gain from the sale of a capital asset, and since at the time he sold the invention in 1917 he had owned it since 1914, more than two years, the gain is taxable to the extent of 50 per cent. 1. The Commissioner urges that the petitioner received, not gain from the sale of a capital asset, but payment of a claim against the United States for use of patents. This disregards the sale by Barlow in 1917, and treats Barlow as the continuing owner of the invention during the time that the United States was using it. While it is true that the United States was paying for the use of the invention, Barlow was receiving the payment not *322 as the inventor or the owner of the patent rights, but as the assignee of the claim from Marlin, of which Congress had authorized recognition. This is not to be obscured by confusing Barlow's position as the original inventor of the drop bomb with his ownership of the claim against the United States by the 1923 contract which also transferred to him the patents and invention rights. His ownership of these rights to the patents was not the ground for his claim against the United States. The claim was founded upon the assignment to him of Marlin's rights to compensation for use and infringement. 2. The Commissioner urges that Barlow did not reduce the invention to actual practice more than eighteen months before the sale to Marlin, and that 100 per cent of the gain is taxable under Section 117. What has been said disposes of that contention on the evidence. It is clear that Barlow reduced the invention to practice, when in Mexico in 1914 he constructed 200 of the bombs and dropped some effectively from aircraft. Cf. Samuel Diescher, 36 B.T.A. 732. The continued work on bombs and the subsequent improvements did not postpone the reduction to practice or *323 his property right of inventor. When he sold his rights to Marlin in 1917, he established that he was selling a capital asset owned more than two years, and that the 50 per cent capital gain provision of the subsequently enacted statute was applicable. 3. The Commissioner urges that Barlow never sold his invention or patent rights, but that the contract of 1917 was a licensing agreement with a right to purchase by the licensee. This predicated upon the fact that by the 1917 contract Barlow had the right to cancel the contract in certain circumstances and that, in fact, the contract was cancelled in 1918 and a new contract made. We see no force in this point, for the contract is a present sale of all Barlow's rights in the invention; the applications were by a separate instrument assigned by Barlow and the down payment was made. The sale was recited in the new agreement in 1918 and reaffirmed in the statement that the patents and applications "shall belong to and remain the property of Marlin". Even if the sale had not been consummated in 1917, as we think it was, it was in any event made in 1918, which was also more than two years after the invention had become Barlow's property. *324 The respondent cites Rotorite Corporation v. Commissioner, 117 Fed. (2d) 245; but that case dealt with a plain licensing agreement, whereas Barlow's agreement, as we have said, was authoritatively recognized as a sale by the Patent Office, in issuing the patent to Marlin, by the Court of Claims, in its findings, and by the District Court and the Court of Appeals of the District of Columbia in Clerk v. Barlow, 122 Fed. (2d) 337. Barlow's right to cancel the contract upon certain contingencies does not detract from the effectiveness of the sale. 4. In our view of the case, it is beside the point whether the award received in 1940 covered the use of the original invention or later improvements. Whatever Barlow had in 1917 he sold to Marlin, and what he received in 1940 was the proceeds of that sale and is the gain therefrom. The Commissioner's argument springs from the fallacious premise that Barlow in 1940 was, as inventor and owner of the original patent, receiving payment for the use of the United States of his patent or invention. The argument, as we have shown, is irrelevant to the correct theory of the petitioner's *325 tax. 5. The Commissioner urges that the capital gain provision is applicable because Barlow did not hold the invention as a capital asset. This, says the Commissioner, is because Barlow was in the business of inventing, developing, and exploiting inventions for profit from 1910 and 1940, and the patents and inventions were properly held by him "primarily for sale to customers in the ordinary course of his trade or business." The evidence shows, however, that Barlow was not in the business of selling inventions or patents. He had no "customers" in an ordinary course of business. Of his many and various inventions, he sold only the drop bomb invention in 1917, under the circumstances stated, and the one to the McCord Radiator Manufacturing Company, not in ordinary course of business, but because of special circumstances. In view of the careful definition of the term capital assets in Section 117 (a) (1), it is not permissible to exclude patents or inventions which are not held for sale to customers, but only licensed, by one who is in business as an inventor and derives gain from giving licenses on his inventions. His inventions were not stock in trade and were not property of a kind *326 of which he included in an inventory, and in 1917 when the inventions were sold to Marlin no patent had yet been issued and consequently there was no subject of a depreciation allowance under Section 23 (1). The decision in Harold T. Avery, 47 B.T.A. 538, contains language suggesting that one who holds patents which he licenses to others at a profit may for that reason be denied the capital gain provision. But that statement was a dictum in the course of consideration whether the taxpayer was engaged in the business of selling patents at a profit. It was not held that the licensing alone by an inventor who does not sell or otherwise hold inventions or patents for sale deprives him of the right or saves him from the burden of the capital gain or loss provision. The Avery decision is, therefore, not controlling. Commissioner v. Hopkinson, supra;Samuel Diescher, 36 B.T.A. 732, affirmed on another point, 110 Fed. (2d) 90. Since the $296,359.60 received in 1940 is capital gain of which only 50 per cent is taxable, there is no need to consider petitioner's alternative *327 contention that if Section 117 is not applicable Section 107 serves to relieve him of tax at 1940 rates upon the full amount. Nor is it necessary to consider the contention that the use of the invention by the United States was in legal effect an involuntary conversion of the invention by the United States and therefore to be taxed as a sale. II. The Commissioner disallowed the deduction of $43,364.04 as "excessive attorney fees", saying - Attorneys' fees in excess of the limitation prescribed by the appropriation Act of 1940, paid for services in connection with the claim for compensation, have been disallowed because such deduction would be contrary to public policy. He also separately disallowed the deduction of the $7,500 paid to Francis Michel. Barlow in the tax year 1940 paid an aggregate amount of $70,500 to the five attorneys (including Michel), and deducting the entire amount. The violation of public policy underlying the disallowance of the deduction of $43,364.04 is that the private act appropriating the award of the Court of Claims restricted the payment of attorney's fees "for services rendered in connection with this claim" to 10 per cent of the amount appropriated *328 in the act. The amount appropriated was $592,719.21 and the limit of the amount which could properly be paid to attorneys for services in connection with the claim was, therefore, $59,271.92. The obvious purpose of the proviso was to limit the amount to be paid for attorneys' services in connection with the claim, and we think it plain that the limitation is addressed to the entire payment for all such services and not to the payment made to each attorney. Such a limitation of 10 per cent, or $59,271.92 to each attorney, would not be a sensible construction. The services of Frailey, Hayworth, Spencer, and Todd, were directly in connection with the claim during its presentation to the Court of Claims. The services of Michel were directly in connection with the claim after the Court of Claims had determined it and when an appropriation was required to effect its payment. Hence the fees for the services of all these attorneys were in the aggregate subject to the limitation of $59,271.92. The aggregate paid to them was $70,500, and to the extent of the excess of $11,228.08 it must be regarded as in violation of the appropriation act and against the public policy expressly enacted by Congress. *329 In disallowing the deduction of $43,364.04, the Commissioner apparently computed this as the difference between $29,635.96 and $73,000. The $29,635.96 is 10 per cent of the part of the claim received by petitioner in 1940 ($296,359.60). There is no foundation for the use of this figure. The limitation of the appropriation act is a percentage, not of the amount paid but of the "amount appropriated", which is $592,719.21. Thus the limit for attorneys' fees is $59,271.92, and the non-deductible part of the $70,500 paid for such services is the excess of $11,228.08. There is no reason for disallowance of any part of deduction of $10,000 paid to Tilson, Stanley & McCuen. Their services were in connection with the defense of Clark's suit in the District of Columbia for a share of Barlow's profits on his invention, and in adjusting the attorneys' charges. They had nothing to do with the claim against the United States, either in the course of the special legislation in Congress or of the presentation in the Court of Claims. The reasons for the disallowance of part of the deduction of the amount of $70,500 are inapplicable to the fee paid Tilson, Stanley & McCuen, and the Commissioner was *330 in error in not allowing the deduction of the entire amount of $10,000 paid to that firm in 1940. Decision will be entered under Rule 50. Footnotes
1. Barlow v. United States, 82 C. Cls. 360, 367; 87 C. Cls. 287↩. 2. Clark v. Barlow, ↩ 122 Fed. (2d) 337.